**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ESTATE OF JACQUELINE NELSON, PATRICE NELSON as Personal Representative of the Estate of Jacqueline Nelson, and GEORGES MICO NELSON, Individually, | : : : : | **AMENDED COMPLAINT** **Jury Trial Demanded** |
| Plaintiffs, | : : | Civil No. 1:21-cv-07811-JMF |
| v. | : : : | |
| MILLERKNOLL, INC., formerly known as HERMAN MILLER, INC., | : : : | |
| Defendant. | : : | |

Plaintiffs, the ESTATE OF JACQUELINE NELSON, PATRICE NELSON as Personal Representative of the Estate of Jacqueline Nelson, and GEORGES MICO NELSON, Individually, (collectively "Plaintiffs") by and through the undersigned counsel, for its Complaint against Defendant MillerKnoll, Inc., formerly known as Herman Miller, Inc. ("Defendant") hereby alleges the following:

## NATURE OF THE ACTION

1.     On information and belief, from about 2005 through the date of the filing of this Complaint, Defendant's predecessor Herman Miller, Inc. ("Defendant") and Defendant has presided over a highly complex and intentionally convoluted fraudulent scheme to steal Plaintiffs' intellectual property—that is, creations of the famous American designer George Nelson—and to divert royalty payments to itself that should have been paid to Plaintiffs.  The scheme played out as follows.

2.      *First*, Defendant created George Nelson Foundation ("GNF"), a nonprofit organization over which Defendant, along with GNF's Director Karen Stein and her company Karen D. Stein LLC (collectively "Stein"), exerted total control and domination.  While GNF purported to be a foundation designed to showcase George Nelson's work, its true purpose was (and has always been) to garner Plaintiffs' trust and to further the fraudulent scheme.  GNF was Defendant's alter ego.

3.      *Second*, after gaining the trust of Jacqueline Nelson ("Mrs. Nelson"),  Defendant used GNF to dupe and defraud Mrs. Nelson—a woman then in her nineties with severely diminished mental and physical capacity—into unwittingly transferring Plaintiffs' valuable intellectual property to GNF, a completely inappropriate vehicle to hold this property, via an invalid and unenforceable intellectual property assignment agreement. By transferring the intellectual property interest to a nonprofit entity, Defendant violated numerous tax laws, compromising the intellectual property and jeopardizing Plaintiffs' interest and ownership of the same.  Defendant also caused Plaintiffs serious tax problems.

4.      *Third*, armed with the intellectual property rights that were fraudulently obtained from Plaintiffs, Defendant caused GNF to initiate an infringement lawsuit in the United States District Court for the Southern District of New York ("SDNY") against a third party called Modernica, Inc. ("Modernica"), a California-based furniture manufacturer and a competitor of Defendant.  During the course of the SDNY proceeding, Defendant caused GNF to make intentionally false and fraudulent statements to Plaintiffs and the Court to strategically intertwine the SDNY dispute with another unrelated case that Defendant had filed against Modernica (the same third-party defendant) in the United States District Court for the Western District of Michigan ("WDMI").  By taking this approach, Defendant was able to craft an omnibus resolution

to *both* the SDNY litigation and WDMI litigation that allowed GNF to orchestrate a direct transfer of Plaintiffs' intellectual property to Defendant under false pretenses.  This strategic and intentionally convoluted transfer—which was a fundamental abuse of GNF's non-profit organizational structure and in violation of numerous United States tax laws—had the effect of fraudulently stripping Plaintiffs of all right and interest in a very valuable and iconic design of lamps (the "Bubble Lamps") and the Bubble Lamp business. Plaintiffs paid for the litigation directly relating to the acquisition of that business. GNF was the sole plaintiff and yet Defendant took ownership of the Bubble Lamp intellectual property and the entire infringing Bubble Lamp business of Modernica in settlement of GNF's lawsuit..

5.       ***Fourth***, Defendant still continues, without the authorization of Plaintiffs, to own and use Plaintiffs' intellectual property in commerce, in violation of Plaintiffs' valid and subsisting rights.

6.       As part of a settlement in a related case, *Patrice Nelson et al* v. *Katten Muchin Rosenman LLP*, Circuit Court of Cook County, Law Division, Case No. 2017-L-008151, Plaintiffs dismissed Defendants GNF, Karen Stein and Karen D. Stein LLC from this lawsuit and recovered certain intellectual property which had been unwittingly assigned to GNF by Jacqueline Nelson. However, certain extremely valuable intellectual property, including that in the Bubble Lamps, already had been fraudulently obtained by Defendant and still has not been recovered by Plaintiffs.

7.       Given all of the foregoing, Plaintiffs hereby asserts claims against Defendant for fraud, conspiracy to commit fraud, unjust enrichment, breach of fiduciary duty, breach of contract, infringement of their intellectual property and unfair competition, for which they seek monetary damages and injunctive relief.  They also seek the cancellation of Defendant's fraudulently obtained federal trademark registrations, U.S. Registration Nos. 3939483 and 3939484.

## PARTIES

8.      Plaintiffs are the Estate of Jacqueline Nelson ("Mrs. Nelson"), Georges Mico
Nelson ("Mico"), who is the son of Mrs. Nelson and the designer George Nelson, and Patrice
Nelson, as the Personal Representative of Mrs. Nelson's Estate ("Patrice").

9.      Mrs. Nelson was the sole devisee of all of the Estate of George Nelson at the time
of his death on March 5, 1986 in New York, New York.

10.      Mrs. Nelson died on December 6, 2017, just shy of her 98th birthday, in Orono,
Maine.  Her Estate is domiciled in Maine.

11.      Except for cash bequests to friends, Mico is sole devisee of the Estate of Mrs.
Nelson and will receive a distribution of the entirety of the assets of the Estate once it is closed.

12.      Mico and Patrice are domiciled in Newburgh, Maine.

13.      Upon information and belief, Defendant MillerKnoll, Inc. is a Michigan
Corporation having a principal place of business located at 855 East Main Avenue, Zeeland, MI
49464.  Defendant is a furniture manufacturer with operations throughout the United States,
including, on information and belief, two stores in New York: 251 Park Avenue S., New York,
NY 10010 and 20 Hudson Yards, Unit 207C, Floor 2, New York, NY 10001. Upon information
and belief, Herman Miller, Inc. changed its name to MillerKnoll, Inc. in November of 2021.

14.      GNF was a nonprofit Michigan Corporation with its principal place of business in
New York, NY. GNF was the alter ego of Defendant, as discussed in greater detail below, and
Defendant controlled its every function.

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C.
§§ 1331, 1332, 1338(a) and (b), and 1367, as well as the supplemental and pendant jurisdiction of

the Court.  Specifically, Plaintiffs' claims are predicated on the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.*, and substantial and related claims under the statutory and common law of the State of New York, the State of Maine, and the State of Michigan. Furthermore, Plaintiffs and Defendant are of diverse citizenship and the amount in controversy exceeds $75,000.

16.    This Court has personal jurisdiction over Defendant because, upon information and belief, it regularly does business in this State and has contributed significantly to the wrongful acts or omissions giving rise to this action, which occurred in this State.  These actions include but are in no way limited to committing trademark infringement, controlling the fraudulent acts of GNF and falsifying facts in order to manipulate a prior lawsuit taking place in this District.

17.    Venue is properly founded in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant is subject to personal jurisdiction within this Judicial District and because a substantial part of the events giving rise to the claims occurred within this Judicial District.

## FACTUAL BACKGROUND

### I.    The Nelson IP at the Center of This Litigation

### A.    The Creator: George Nelson - A Founding Father of American Modernism

18.    George Nelson (husband of Mrs. Nelson and father of Mico) was a famous American industrial designer and one of the founding fathers of American Modernism.  During his lifetime, he created designs of many of the 20th century's most iconic modern furniture. George Nelson has been the subject and author of several books on iconic American design.

19.    George Nelson received numerous awards and recognition for his design legacy, including places in the permanent collections of the Museum of Modern Art; Brooklyn Museum

of Art; Philadelphia Museum of Art; Lifetime Achievement Award; American Institute of Graphic Arts (1991); Scholar in Residence, Smithsonian Institute National Museum of Design (1984); Creator and Chairman, International Design Conference in Aspen (1965 and 1982); Good Design Award, Museum of Modern Art (1954); Trailblazer Award, National Home Furnishings League (1954); Best Office of the Year, New York Times (1953); Gold Medal, Art Directors Club of New York (1953); and Prix de Rome for architecture (1932).

20.    George Nelson founded his own design firm, known as George Nelson & Associates, and then George Nelson & Co., through which he designed many well-known modern furniture designs and, also functioned as Director of Creative Design for Defendant as an independent contractor.

21.    George Nelson also introduced the then-President of Defendant, D.J. De Pree, to Charles and Ray Eames ("Eames") and to at least two other icons of modern furniture design (Alexander Girard and Isamu Noguchi), with all of whom Defendant enjoyed a collaboration stretching decades, and with whose heirs Defendant continues to collaborate to the present day. George Nelson was instrumental in putting Defendant on the map of modern furniture design.

**B.    George Nelson's Iconic Bubble Lamps and Other IP**

22.    George Nelson built considerable goodwill during his lifetime in the George Nelson name and in his designs and associated common law trademarks, including, without limitation, in the lamps shown in **Exhibit "A"** known as the "Bubble Lamps."

23.    The iconic Bubble Lamps designed by Mr. Nelson in the early 1950's are among the most widely recognized of George Nelson's designs.

24.    At their creation, the Bubble Lamps were made by Mr. Nelson and then by others under license from him.  Mr. Nelson never transferred ownership of the Bubble Lamp designs or any related word marks to anyone during his lifetime.

25.    George Nelson himself also designed and created the unique equipment that is still used today to create the Bubble Lamps.

26.    George Nelson died on March 5, 1986.  Upon his death, his widow, Mrs. Nelson, inherited the valid intellectual property rights and interests that George Nelson held at the time of his death (the "Nelson IP"), which he had accumulated throughout his distinguished lifetime of achievement and recognition in modern American design.

27.    The Nelson IP, inherited by Mrs. Nelson, included various furniture designs and the common law trademarks NELSON and GEORGE NELSON (the "Nelson Marks").  It also included the common law trademark BUBBLE LAMPS, as well as rights in the highly distinctive Bubble Lamp product designs (collectively, the "Bubble Lamp IP").

28.    The Nelson IP, including the Nelson Marks and Bubble Lamp IP, are quite distinctive and have acquired significant secondary meaning, by virtue of George Nelson's and Mrs. Nelson's exclusive use themselves and/or through licensees for more than fifty years, as well as their extensive marketing and advertising efforts.

29.    Indeed, for years after the Bubble Lamps were initially created by George Nelson, they were manufactured and sold under license from George Nelson (and then under license from Mrs. Nelson) to a company named Howard Miller, Inc., who bore no relation to Defendant. Howard Miller, Inc. used the Nelson-designed equipment to make the Bubble Lamps and paid royalties to the Nelson family.  Howard Miller Inc. ceased payment of royalties to Mrs. Nelson in 1991.

30.     In 2003, Mrs. Nelson entered into a license agreement with Vitra Collections AG ("Vitra"), a furniture manufacturer headquartered in Switzerland with close business ties to Defendant, to make and sell the Bubble Lamps worldwide.

31.     Unbeknownst to Mrs. Nelson and without her authorization, at some point before the Vitra license was signed, a company called Eurolighting had purchased the Nelson-designed equipment to make the Bubble Lamps from a prior manufacturer, and began to make and sell Bubble Lamps in the United States through Modernica, which, as mentioned above, is a California-based furniture manufacturer and a competitor of Defendant.

i.     **Non-Party Modernica's Unauthorized Misappropriation of the George Nelson IP**

32.     Modernica's purchase of the Nelson-designed equipment did not, by any stretch authorize Modernica or anyone else to sell infringing copies of the Bubble Lamps, or to use the Bubble Lamp IP or Nelson Marks in any other way. The ownership of equipment does not confer upon the owner the right to make and sell product designs owned by another.

33.     But despite its lack of ownership in any of the Nelson IP, on May 29, 2009, Modernica filed unauthorized applications Serial Nos. 77748146 and 77748149 seeking to register the design configurations of the two Bubble Lamp Designs shown in **Exhibit "B"** (the "Design Applications"), application Serial. No. 78241824 to register the word mark BUBBLE LAMPS ("Bubble Lamps Word Mark"), and applications to register the word marks NELSON and GEORGE NELSON with the United States Patent and Trademark Office ("USPTO").

34.     This use and attempted registration was blatant infringement and misappropriation of Plaintiffs' Nelson IP, specifically the Nelson Marks and Bubble Lamp IP.

35.     Registration initially was refused to Modernica by the USPTO of both Design Applications in Office Actions dated October 9, 2009 on the grounds that the applied-for marks

consisted of non-distinctive product designs or non-distinctive features of a product design that are not registrable on the Principal Register without sufficient proof of acquired distinctiveness under §§ 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§1051-1052, 1127.

36.    Modernica responded to the Office Actions on April 9, 2010, including a Declaration of its President, Frank Novak, who improperly and fraudulently relied on the enormous recognition and goodwill in the Bubble Lamp designs garnered for over fifty years by George Nelson and his Estate to assert that Modernica had developed secondary meaning in the Bubble Lamp product configurations.

37.    Specifically, Mr. Novak asserted that the Bubble Lamps "have enjoyed substantial renown due to their provenance as products designed by the famous and highly regarded George Nelson.  Over time they have come to be regarded as icons of the mid-century modernist design aesthetic."   Mr. Novak went on to explain in his Declaration that because of the specialized manufacturing process and equipment required to produce the Bubble Lamps, products bearing the Bubble Lamp design configuration, or trade dress "have always originated from a single source and no one has ever imitated the process, or as a result, the designs that comprise …[the Bubble Lamps]."  He continued to state that "[c]onsumers since the 1950's have thus always associated the 'George Nelson Bubble Lamps' as they are often called…with a single source, which has for the past decade plus been the Applicant, Modernica."

38.    This statement, which Mr. Novak undoubtedly knew at the time was utterly false and misleadingly, asserts that Modernica is the owner of the goodwill and recognition in the Bubble Lamp IP created and owned by George Nelson.  Trademarks on product configurations, such as the design of a lamp, are difficult to obtain and require a detailed showing of consumer recognition over a long period of time, along with strong consumer recognition, significant sales

and advertising.  Reliance on the status of the Bubble Lamps as "icons of the mid-century modernist design aesthetic," without any transfer from George Nelson or his successors in interest of the good will in this "iconic status," was quite simply fraudulent.  The statement was directly made to cause the U.S. Trademark Office to issue registrations to Modernica, which essentially stole the rights to the Bubble Lamp IP, and fraudulently inserted itself as the owner of all rights, goodwill and recognition therein and associated therewith.

39.    Indeed, on April 5, 2010, as a direct result of Mr. Novak's fraudulent statements, the Design Applications matured into U.S. Registration Nos. 3939483 and 3939484 in the name of Modernica (the "Modernica Design Registrations").

40.    As will be discussed in Section III below, Defendant directed GNF to sue Modernica to seek cancellation of the Modernica Design Registrations on grounds they were procured by fraud (the "Bubble Lamp Lawsuit").  Defendant charged Plaintiffs for, and Plaintiffs paid, legal fees incurred in the Bubble Lamp Lawsuit, as they believed the misappropriated Bubble Lamp IP would be recovered by GNF, the sole Plaintiff in that action, and that Plaintiffs would receive royalties for its subsequent use.  But in reality, Defendant, a non-party to the Modernica lawsuit, fraudulently obtained the Bubble Lamp IP at the conclusion of the Bubble Lamp Lawsuit, to Plaintiffs' severe detriment, as addressed in Section III below. Also, though they paid for the lawsuit, Plaintiffs are not receiving royalties for the sale of the Bubble Lamps themselves.  **II.**

**Defendant's Fraudulent Scheme to Obtain the Nelson IP**

**A.    Initial, Unsuccessful Attempts to Usurp the Nelson IP from Mrs. Nelson—a Woman of Advanced Age and Rapidly Deteriorating Mental and Physical Health**

41.    As mentioned previously, George Nelson had his own design company, Nelson & Associates (later known as Nelson & Co., Inc.), at the same time that he worked as Defendant's

Creative Design Director as an independent contractor (not an employee).  Letters and documents dating back to the 1940s to 1980s reveal that Defendant was indeed a client of George Nelson's firm—and a bad one at that.  Defendant was demanding but was not particularly good at paying bills.

42.    There were no written contracts in the early days of George's work with Defendant, and, accordingly, there is no evidence that any of his furniture designs were created as work for hire with Defendant or otherwise owned by Defendant.

43.    Egregiously, however, after George Nelson's death, Defendant took advantage of the situation—in particular, of Mrs. Nelson's advanced age and diminished capacity —to try to obtain her admission that Defendant (and not George Nelson) somehow owned all of George's furniture designs and related intellectual property.

44.    In fact Vitra (which again, had close business ties to Defendant) actually teamed up with Defendant in a campaign to convince Mrs. Nelson to unwillingly (and unwittingly) transfer all of her rights in the Nelson IP to them. Both informed her that not doing so jeopardized the Nelson IP—which was a lie.

45.    For example, on March 25, 2005, when Mrs. Nelson was 86 years old, John Berry ("Berry"), who was then a consultant to Defendant, but who had been employed by the company as a vice president of corporate communications for 16 years in the past, wrote Mrs. Nelson a letter saying, "I know I keep harping on this point of your assigning design rights, but I do think it is important."  He urged her again to reconsider transferring her rights because not "[n]ot assigning the rights puts them into the public domain and opens wide the ability to copy the designs, confuse the public and reduce royalties." *Id.*  This was a lie.  It is not correct that design rights go into the public domain if they are not assigned to a foundation or some other entity.

46.    Berry stated further that "[i]t is my understanding that the process of your assigning rights can be simple and my guess is that HMI [Defendant] would be glad to provide any legal assistance if needed.   They would have a vested interest in seeing the authentic designs maintained." *Id.*  The director for retail at Defendant was copied on the letter. *Id.*

47.    Unsure of what to do, in April 2005 Mrs. Nelson reached out to Rolf Fehlbaum ("Fehlbaum"), then Chairman of Vitra, for a second opinion. Vitra and Defendant have very close business ties.  Fehlbaum responded in an email dated May 2, 2005, forwarding an opinion from his attorney, who opined that all of George Nelson's work belonged to Defendant and that Mrs. Nelson should assign her rights to an entity like Vitra or a foundation to protect it.

48.    Fehlbaum was someone who Mrs. Nelson deeply trusted and this fact was well known by anyone who knew Mrs. Nelson, including Fehlbaum.

49.    Mrs. Nelson's trust in Fehlbaum was also noted by Philip Raible ("Raible"), her personal counsel in New York who, in an email to Fehlbaum's attorney, stated that "Mrs. Nelson is (as you know) exceedingly close to, and comfortable with, Rolf Fehlbaum."

50.    Indeed, Defendant and Vitra engaged Fehlbaum whenever they wanted Mrs. Nelson to take a course of action that they desired.   In this case though, Berry had been unsuccessful in convincing Mrs. Nelson to transfer her rights.  After talking with Rolf about this issue, on May 31, 2005 Mrs. Nelson wrote a memorandum to Defendant, that she was "considering establishing an entity which would guarantee authenticity of reproductions and ensure quality is maintained."  She did not commit, however, to actually transferring her intellectual property rights to any entity.   Fehlbaum's seal of approval therefore did prompt Mrs. Nelson to rethink the proposals Berry made.

51.    In a clearly joint effort, Defendant in or about May 2005, sent Mrs. Nelson a proposed royalty contract to consider.  It was very one-sided and purported to confirm Defendant's "ownership" of all Nelson IP pertaining to furniture designs, even a design created before George Nelson was working with Defendant as Creative Director.

52.    Mrs. Nelson responded to the draft Royalty Agreement via a memorandum to Defendant  dated May 31, 2005, asking some pointed questions about the terms of the draft royalty agreement, including questioning the extremely low 0.5% royalty rate then proposed by Defendant and the products to be included in the agreement.  She also asked for "copies of the agreements and modifications referred to in" the draft royalty agreement.  As to the royalty rate, Mrs. Nelson asked for information about sales volume and mentioned that the 0.5% proposed royalty rate, which was apparently described as an increased rate, was actually the "reverse" of a rate increase because Mrs. Nelson thought the family had been receiving a 3% rate since 2001.  It does not appear that Mrs. Nelson ever received the information she requested.

53.    Mrs. Nelson shared the proposed draft royalty agreement with her personal counsel, who modified the agreement to limit Defendant's ownership of the Nelson IP to "Nelson designed products, as to which HMI [Defendant] owns the right to George Nelson designs for furniture products and patterns, including the products listed on Exhibit A."   On information and belief, there is no George Nelson design that was "owned" by Defendant and knowing this, Defendant prepared the 2006 agreement in attempt to solidify rights it never had in George Nelson's designs. For example, in the so-called Exhibit A list, the Nelson platform bench is included.  However, the platform bench was created before George Nelson met Defendant.  Also on information and belief, Defendant attempted to do the same with George Nelson when he was alive.  George did not agree to such a contract.

54.     Defendant was only paying very minimal royalties of 1.5% to Mrs. Nelson, despite discussions with her about a 3% royalty rate in the past.  Defendant never seemed to correct Mrs. Nelson's perception of the rate of royalty the family was receiving.  She thought, until the day she died, that the Nelson family was receiving 3% in royalties.

55.     Even Fehlbaum's strong influence was not enough to persuade Mrs. Nelson this time to transfer her IP interest to Defendant.  It eventually became clear to Defendant that Mrs. Nelson would need a more aggressive push—and that they would need to devise a plan for delivering that push as soon as possible.

**B.     Upping the Ante: Defendant' Secret and Unauthorized Formation of the George Nelson Foundation to Obtain the Nelson IP Under False Pretenses**

56.     Over the next few years, Defendant increased its efforts to obtain control of the totality of the Nelson IP, recognizing that it had enormous value as some of the most iconic furniture in the world.

57.     As part and parcel to its duplicitous strategy, in late 2009 or early 2010, Defendant approached Mrs. Nelson about the concept of forming a nonprofit foundation—that is, GNF.

58.     Defendant was the leading force behind the formation of GNF.

59.     Tellingly, another leading force behind the formation of GNF was Vitra and its Chairman of the Board, Fehlbaum.

### i. The Story Defendant Told Mrs. Nelson Regarding GNF to Gain Her Trust

60. Defendant began by emphasizing to Mrs. Nelson that the purpose of GNF would be to educate, exhibit, and advance the legacy of George Nelson's contributions to American Modernism.

61. In or about January 2010, Berry sent a proposal for GNF to Mrs. Nelson's attorney, Raible, along with proposed Articles of Incorporation and Bylaws. The proposal explicitly noted that the objective in January 2010 was to "[g]ain Jacquie Nelson's granting of rights to the foundation."

62. On March 9, 2010, Mrs. Nelson, through her attorney, Raible, reached out to Fehlbaum expressing skepticism over the need for, and the purpose and viability of, such a foundation. However, Fehlbaum never responded to Raible's March 9, 2010 email.

63. In the meantime there were communications between Fehlbaum and Brian Walker, Defendant's Chief Executive Officer, about "how to approach Mrs. Nelson" with a draft proposal for the establishment of a foundation.

64. On May 3, 2010 a revised proposal was prepared and, despite Mrs. Nelson's expressed concern about being forced or pressured to personally support the foundation in any way, the proposal continued to maintain its objective to "gain Mrs. Nelson's granting of rights to the foundation."

65. In correspondence dated July 29, 2010, President and CEO of Defendant, Brian Walker ("Walker"), purportedly together with Fehlbaum, jointly wrote to Mrs. Nelson to formally ask for her support in establishing a foundation to "protect, promote and extend the legacy of George Nelson's work." They stressed that the foundation would have an "independent nature." *Id.*

66.     In that same correspondence, which was on Defendant's letterhead, it was stressed that the establishment of the foundation would not require Mrs. Nelson to "make any legal transfer of rights." *Id.*

67.     In reliance on the representation that: (1) Mrs. Nelson would not be required to transfer any of her rights in the valuable Nelson IP she had inherited from her husband; and (2) that GNF would educate, exhibit, and advance the legacy of George Nelson's contributions to American Modernism, Mrs. Nelson responded to Walker on August 9, 2010, telling him that that she would support development of GNF.

### ii.        The Sinister Reality of GNF, Defendant's Alter Ego

68.     While Defendant and Fehlbaum created the appearance of seeking approval from the Nelson family to create a foundation, the reality was that, unbeknownst to Mrs. Nelson (or any of the other Plaintiffs), GNF already had been established six months before.  Specifically, GNF was registered as a non-profit Michigan corporation on February 11, 2010 by Defendant without consulting the Nelson family, and without the Nelson family's approval or authorization, as a nonprofit Michigan corporation.  The true purpose of GNF, as discussed herein, was to function as Defendant's alter ego and to serve as the vehicle through which Defendant perpetrated widespread fraud.

69.     The Incorporator of GNF was James L. Hopewell ("Hopewell"), then the Associate General Counsel of Defendant.

70.     The Registered Agent of GNF, at the time it was secretly incorporated, was Berry, then Vice President of Corporate Communications at Defendant.  The address of the registered office of GNF initially was, upon information and belief, Mr. Berry's home address.

71.    In 2010, the registered office of GNF was changed to (and still is) 855 E. Main Avenue, Zeeland, MI 49464.  This was, and still is, the main headquarters address of Defendant.

72.    In 2013, the Registered Agent of GNF was changed to Tim Lopez ("Lopez"), Senior Vice President of Legal Services and Secretary of Defendant.  Mr. Lopez remained the Resident Agent of GNF until he left the employ of Defendant in October 2018.

73.    Although Walker had previously assured Mrs. Nelson that GNF would have an "independent nature," Defendant filled GNF's Board of Directors with individuals with close ties to itself.

74.    Specifically, in 2011 a Board of Directors was designated and included Ben Watson ("Watson"), the Executive Creative Director of Defendant, as President; Karen Stein, a woman with ties to Fehlbaum and Vitra, as Executive Director; Fehlbaum, as Director; Sally Wisbang, Executive Assistant at Defendant, as Secretary and Treasurer; and Barry Bergdoll, the Chief Curator of Architecture and Design at the Museum of Modern Art in New York ("MOMA"). Upon information and belief, Karen Stein's initial compensation as GNF's Executive Director was paid directly by Defendant, not GNF Nelson.

a.    **Conflicts of Interest Abound at GNF**

75.    Defendant was one of two initial donors to GNF.  The other was Vitra. Defendant and Vitra were, and remained during its operations, GNF's only contributors.

76.    Importantly, as a substantial contributor to the nonprofit, Defendant is deemed a disqualified party within the meaning 26 U.S.C. §§ 4941 and 4946 of the tax statutes.  As a disqualified party, Defendant is and was prohibited from using its relationship with GNF to engage in self-dealing transactions.  *See* 26 U.S.C. §§ 4941.  Similarly, GNF and Stein, as Executive Director, were under an obligation to avoid transactions in which a conflict of interest might exist

17

with substantial contributors.  Indeed, GNF's Bylaws and its Articles of Incorporation prohibit transactions that have even an appearance of a conflict of interest.

77.     Nonetheless, Defendant, Stein, and GNF ignored GNF's Bylaws and its Articles of Incorporation and the relevant tax statutes, and did not keep the necessary boundaries to prevent a conflict of interest from happening, all to the detriment of Mrs. Nelson and the Nelson family.

78.     After forming GNF, Defendant manned the organization with cronies who had connections with, or were subordinate to Defendant.  Defendant used these connections and its financial contribution to control GNF, its alter ego, and to perpetrate far-reaching fraud.

**C.     GNF Finally Succeeds in Duping Mrs. Nelson—Who Is Cognitively Impaired and Physically Incapacitated—Into Signing Away Her Intellectual Property Rights**

79.     In October 2012, GNF, with the assistance of a lawyer it hired named William Dorsey ("Dorsey"), doubled down on its efforts to have Mrs. Nelson assign all of her rights in the Nelson IP to GNF via an Intellectual Property Assignment Agreement ("IPAA").

80.      Specifically, on October 24, 2012, Ms. Stein (who, again is GNF's Executive Director), forwarded to Mrs. Nelson a draft IPAA assigning to GNF literally all of the Nelson IP she had inherited from her husband in a broad, sweeping and irrevocable assignment and transfer. Mr. Dorsey and Ms. Stein presented the assignment as necessary to enforce the rights in the Nelson IP (and ultimately benefit Mrs. Nelson), which was not true.

81.     Not surprisingly, Ms. Stein sent this first draft IPAA to Mrs. Nelson via email, copying Fehlbaum (rather than Mrs. Nelson's attorney, Raible).

82.     Mrs. Nelson never responded to the email.

83.     On November 26, 2012, Mrs. Nelson suffered a fall at home and broke her hip. She also had bladder cancer and was receiving radiation therapy during this timeframe and was very weak—a point noted by Ms. Stein each time she communicated with Mrs. Nelson about the IPAA.

84.     But in spite of Mrs. Nelson's health condition, Ms. Stein forged on to get the IPAA signed.  Sometime in December 2012, Ms. Stein wrote a handwritten note forwarding a second draft of the IPAA for Mrs. Nelson's review.  Again there was no suggestion that Mrs. Nelson speak to Raible or another independent counsel.

85.     Mrs. Nelson did not respond to this communication either.

86.     Plaintiffs Mico and Patrice Nelson moved Mrs. Nelson to Maine because of her rapidly declining condition.  Mrs. Nelson was permanently disabled from the fall and needed a walker to ambulate and her apartment was not handicap accessible.  Mrs. Nelson was transported to Maine by a private ambulance on December 18, 2012.

87.     Nonetheless, Ms. Stein still persisted in getting the IPAA signed.  She emailed Mrs. Nelson at 9:50 pm on January 23, 2013, copying Patrice (rather than Mico, Mrs. Nelson's son and legal agent), and attached the "final" version of the complex IPAA that Mrs. Nelson was expected to sign.

88.     Neither Mrs. Nelson, nor Patrice, responded to the January 23 email.  However, despite their lack of a response, Dorsey sent out an express mail package with the final copy of the IPAA the next day, on January 24, 2013, with "sign here" stickers instructing Ms. Nelson where to sign.  A return Federal Express envelope was also provided.

89.     On the date the package was sent, January 24, 2013, Mrs. Nelson was 93 years old and was in a rehabilitation center/nursing home in New Castle, Maine.  She was still seriously ill

from bladder cancer treatment, recovering from a hip fracture, and was suffering from a diminished mental capacity.

90.     Nonetheless, Dorsey mailed the finalized assignment to Mrs. Nelson to sign—and she finally did so, likely without any idea of what she was signing.

91.     Importantly, there were no witnesses to Mrs. Nelson's signing of the IPAA, and her son, Mico, who was then her legal agent under a power of attorney, was not present, nor was he directly or indirectly notified of GNF's intentions with respect to the family legacy.

92.     When Mrs. Nelson signed the "final" IPAA, she wrote "1/24/2013" as the date of execution.  (**Exhibit "C"** (IPAA)).  Clearly, Mrs. Nelson could not have received the agreement until sometime after 1/24/2013 - the date Dorsey sent the forms to her from Illinois. On information and belief, Mrs. Nelson saw Dorsey's cover letter, which was dated 1/24/2013, and followed suit.

93.     The signed IPAA was mailed back to Dorsey on 1/29/2013.  This transaction establishes that, at the time she was presented with the contract, Mrs. Nelson was not oriented as to time, which is one of the indicators of diminished capacity.

94.     Mrs. Nelson's treating providers in Maine determined that she lacked the capacity to execute such an agreement at that time and should not have been made to execute the same.

95.     Indeed, the issue of Mrs. Nelson's capacity to execute the IPAA was raised by at least one entity against which GNF attempted to enforce the Nelson IP.

96.     Upon information and belief, GNF's own counsel had concerns about Mrs. Nelson's capacity to sign the IPAA as well.

97.     Furthermore, even if Mrs. Nelson had the requisite cognitive capacity to sign a legal document, which she did not, she could not be expected to understand this particular complex contract on her own.  The failure to advise her to seek independent counsel, in light of what she

was being asked to give up, is unconscionable and is prohibited under, at the very least, Maine law which, in view of undue influence risks to older individuals, proscribes a transfer of assets valued at more than 10% from an individual's estate without independent counsel engaged if that individual is 60 years or older. *See* 33 M.R.S.A. § 1021 *et. seq.*

98.     If such a transaction occurs, it is presumed that the transfer or execution was the result of undue influence, unless the elderly dependent person was represented in the transfer or execution by independent counsel.

99.     Defendant, Stein, and GNF knew that Mrs. Nelson had a private attorney and they did not give her time to consult with that attorney, nor did they mention that she should do so. Rather, Defendant, Stein and GNF all intentionally circumvented Mrs. Nelson's private attorney yet again, in violation of the law.

100.    It is important to point out that neither Patrice nor Mico even knew Mrs. Nelson signed the IPAA until more than a year later. The transfer of the Nelson IP was never reported to the IRS, which is required.  Accordingly, the transfer was secret to all but Defendant and GNF.

101.    Rather, Patrice found a copy of the IPAA in a Depend Adult Diaper box in March 2014 under Mrs. Nelson's bed.  Patrice asked Mrs. Nelson about the documents and Mrs. Nelson did not recall ever signing any paperwork.  Mrs. Nelson also denied that she would ever give anything to the GNF because she felt GNF was never going to be viable.

i.    **Terms of the IPAA, as Executed**

102.    The final IPAA effectively put all of the Nelson IP in the hands of GNF, an organization that was a puppet and alter ego of Defendant, giving Defendant what it had been working to obtain since George Nelson died.

103.    The scheme usurped Mico's interest as Mrs. Nelson's heir, as well as his birthright to his father's creations.

104.    The IPAA did, however, acknowledge that "as consideration for the assignment of the Intellectual Property hereunder, [GNF] agrees that all royalties otherwise payable to [GNF] in connection with any (existing or future) license or assignment to any third party of the Intellectual Property . . . be paid to [Mrs. Nelson] and/or her heirs, assignees, or successors (as applicable)." However, the IPAA provided that, immediately on Mrs. Nelson's death, the royalty interest would flow to GNF, her "successor-in-interest" under the terms of the IPAA. The only way to curb this result was to assign the royalty interest to Mico before Mrs. Nelson passed away.  Because Mrs. Nelson was incapacitated, Mico was forced to petition the Maine Probate Court to transfer the royalty interest to himself.  The Court granted the request in September 2016.  The forced lifetime transfer to protect the royalty interest resulted in the charge of substantial gift taxes against the family.

105.    The IPAA further provides that GNF "acknowledges that [Mrs. Nelson] shall have approval rights over any changes or modifications to the [Defendant License] or VDM Licenses – and any new licenses – during her lifetime."

106.    The IPAA also states that GNF "acknowledges and agrees that all royalties payable to [GNF] in connection with the license of any Intellectual Property to a third party is and continues to be for the benefit of [Mrs. Nelson] and/or her heirs, assignees, or successors."

107.    In addition, the IPAA indicates that GNF "shall not assign or otherwise transfer this Agreement, or any of its rights or obligations under this Agreement, without the prior written approval of the other Party."

108.    The IPAA also recognizes that "this Agreement is binding upon, and shall inure to the benefit of the Parties and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns . . . ."

109.    However, the IPAA also contained a term making GNF the successor-in-interest of the royalty rights in the Nelson IP immediately upon Mrs. Nelson's death, unless she assigned to Mico before her death.

110.    Defendant, Stein and GNF were clearly hoping the Nelson family would not notice this provision.  But the family's Maine counsel did notice and petitioned the Maine Probate Court for a single transaction authority to transfer the royalty interest to Mico in order to keep it from being diverted to GNF. The Court agreed that the IPAA was deviating the royalty interest to GNF and granted the transfer of the royalty interest to Mico in September 2016.

111.    At no time did Defendant, Stein, or GNF explain to Mrs. Nelson the extremely detrimental tax effect (explained in Section V) of transferring assets she and the Nelson family needed to live on to a nonprofit, nor did Defendant ever explain the problem of receiving royalties from contributed assets.

**ii.    The Maine and Illinois Litigation Pertaining to the IPAA**

112.    Neither Fehlbaum (Mrs. Nelson's trusted friend), Stein, GNF nor Defendant discussed the propriety of transferring out of Mrs. Nelson's estate, assets she needed to live on. These parties also failed to mention what tax implications there might be for such a transfer and,

none of them discussed the tax pitfalls of transferring an interest to a nonprofit while retaining some interest in the assets transferred.

113.    GNF and Dorsey's portrayal that GNF and the Nelson family had a "common interest" and that GNF was looking after the Nelson family's IP interest disguised GNF and Defendant's true intentions, which was to terminate royalty payments to the family and redirect them to GNF and to direct the Bubble Lamp IP to Defendant.

114.    Those underhanded intentions started to come to light in late 2016 and early 2017 and Plaintiffs filed a lawsuit in Maine to unravel that IPAA pursuant to the Maine Improvident Transfer of Title law, which is intended to protect elderly individuals from being swindled by those with whom they have close relationships, including, but not limited to, friends and fiduciaries. That action was dismissed without prejudice on April 14, 2017, to allow a new action to be filed in Illinois that would address, *inter alia*, the impropriety of the IPAA and legal malpractice claims against various attorneys.  Plaintiffs instituted the Illinois lawsuit originally on August 10, 2017, in the Circuit Court of Cook County, Illinois, Law Division (Docket No.:  2017-L-008151).  An Amended Complaint was filed on April 17, 2017.

**III.    Armed With GNF's Fraudulently Acquired Nelson IP, Defendant Negotiates a Convoluted Omnibus Settlement Agreement Resolving Two Separate Lawsuits Against Modernica that Resulted in the Transfer of the Bubble Lamp IP *from GNF to Defendant***

115.    Back in  2012, GNF's lawyer, Dorsey, began assisting GNF in addressing infringements of the Nelson IP by Modernica addressed in Section I.B.i. above—that is, the Bubble Lamp Lawsuit.  Dorsey agreed to handle this matter *pro bono*.

116.    In addition, Dorsey entered into a Joint Interest Agreement with Defendant, and he and his firm helped Defendant in a separate and unrelated lawsuit Defendant brought against Modernica in WDMI, regarding furniture designed by Eames (the "Eames Lawsuit").

24

A.    **GNF's Bubble Lamp Lawsuit Against Modernica Becomes Improperly Intertwined with Defendant's Eames Lawsuit**

117.    On May 21, 2013, after GNF fraudulently obtained the Nelson IP via the IPAA, Dorsey filed the Bubble Lamp Lawsuit against Modernica on GNF's behalf in SDNY.

118.    In the Bubble Lamp Lawsuit, GNF sought injunctive relief and damages for acts of infringement of the Nelson Marks, false designation of origin, unfair competition, and unfair and deceptive trade practices engaged in by Modernica in violations of the laws of the United States and the State of New York.  One of the Counts in the SDNY Lawsuit sought cancellation of Modernica's Design Registrations for two Bubble Lamp designs and the BUBBLE LAMPS Word Mark based on fraudulent procurement.  All of these items infringed on the Nelson IP which GNF had itself fraudulently acquired.

119.    Defendant, which was not a party to the Bubble Lamp Lawsuit (but was a party to the separate Eames Lawsuit in WDMI), used its connection with GNF to obtain strategic information about Modernica, some of which, upon information and belief, was subject to a stipulated protective order issued by the New York Court.  Defendant used this information, to which it was not entitled, to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamp IP.

120.    Indeed, even Modernica expressed concern over the interconnectedness of GNF and Defendant multiple times.  Upon information and belief, in July 2014, Modernica's counsel asked Dorsey if there was a joint defense agreement between GNF and Defendant.  Dorsey acknowledged that GNF did, in fact, have a common interest agreement with Defendant. Given that GNF's express purpose was to protect the legacy of George Nelson, it is not clear what its common interest could be with Defendant.

121.    The "common interest" agreement between Defendant and GNF that produced such a close working relationship against unrelated third parties poses serious conflict-of-interest problems for GNF, a nonprofit entity.  The agreement also demonstrates Walker's statement to Mrs. Nelson in 2010—i.e., that GNF would be "independent in nature"—was false and made solely to obtain her support.

122.    In fact, Modernica raised the interconnectedness of Defendant and GNF with the New York Court in the Bubble Lamp Lawsuit.  In Modernica's reply in support of its motion to compel production of documents and provide substantive interrogatory responses relating to questions raised about Defendant and GNF's relationship, Modernica asserted as follows:

> It is undisputed that HMI is a licensee of The Foundation. However, as contended by Defendant, HMI is much more than a licensee; it is the benefactor to The Foundation.  In other words, HMI effectively operates and controls that entity.  As such, as contended by Defendant, The Foundation is not a standalone not-for-profit organization, but rather, an extension of HMI's internal marketing departments.

*GNF v. Mod* (NY) (1:13-CV-03427-MMB), ECF No. 97.

123.    Given the foregoing, it is quite clear that decisions by Stein and GNF relating to the Nelson IP in the Bubble Lamp Lawsuit (and otherwise) were always made with Defendant's interest as key and with Defendant's involvement.

124.    Furthermore, despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses after she was coerced into executing the IPAA.

125.    In fact, upon information and belief, Modernica approached GNF multiple times to convey the message that they were very interested in negotiating a license to produce and sell the Bubble Lamp in settlement of the Bubble Lamp Lawsuit, but Stein and GNF repeatedly rejected

the offers because of their preference for Defendant and because, pursuant to the IPAA, the royalties from an agreement with Modernica would inure only to Mrs. Nelson's benefit (and not GNF or Defendant).

126.    Upon further information and belief, the first offer from Modernica was made even before GNF filed the Bubble Lamp Lawsuit.  Had GNF accepted, the Nelson family could have avoided the stunning legal fees from the Bubble Lamp Lawsuit, and the Bubble Lamp IP interest could have been safeguarded from Defendant.

127.    Instead, upon information and belief, Stein discussed with certain Board members of GNF (but not Barry Bergdol, the only board member not connected to Vitra or Defendant) her preference that Defendant produce the Bubble Lamps.

128.    Furthermore, upon information and belief, Lopez and Dorsey colluded heavily with respect to settlement opportunities in the Eames and Bubble Lamp Lawsuits that would result in the Bubble Lamp IP being transferred to Defendant.  Upon information and belief, it appeared that Modernica was desperate to settle the litigations and was interested in a buyout.

129.    However, Stein and Dorsey never informed the Nelson family that Modernica was interested in selling the Bubble Lamp business nor was the family ever notified that Modernica offered other options to resolve the GNF action.  This offer and the offer of other options to resolve the lawsuit was only presented to Defendant, which was not a party to, nor was it paying for, the Bubble Lamp Lawsuit.

**B.    Defendant Lied to the U.S. District Courts in New York and Michigan In Order to Transfer the Ownership of the Nelson IP from GNF to Defendant**

130.    On information and belief, throughout settlement discussions in the Eames Lawsuit and Bubble Lamp Lawsuit in 2014 and 2015, GNF and Defendant repeatedly misrepresented to

the court in the SDNY and the Western District of Michigan ("WDMI") the nature of the intellectual property at issue and who, exactly, owned what.

131.    On further information and belief, Dorsey (who was GNF's counsel in the Bubble Lamp Lawsuit but *was not* counsel for Defendant in the Eames Lawsuit), actually attended a settlement conference in the Eames Lawsuit.

132.    Because of Defendant' misrepresentations, the WDMI Court did not see anything amiss and the SDNY Court did not have any idea that the Bubble Lamp IP at issue before it was being transferred essentially in connection with settlement of the unrelated Michigan action without Plaintiffs' knowledge or consent.

133.    The day after the conference in the Eames Lawsuit, on information and belief, Dorsey asked Modernica to agree to a stay in all scheduled depositions.

134.    Modernica and GNF then drafted a joint letter to the New York Court acknowledging that Dorsey had appeared at the Michigan settlement conference and indicating that the parties were discussing settlement.  They asked for a stay in the New York proceeding pending negotiations.

135.    On February 24, 2015 Mrs. Nelson's attorney emailed Mico stating "Will Dorsey called me this morning to discuss a few items. . . . The second item is that he was driving to Grand Rapids to attend a mediation involving Modernica.  The principal purpose of the mediation relates to a litigation involving Modernica and Eames family/foundation, but Modernica asked Will to meet them so they can discuss possible settlement.  Will is cautiously optimistic.  He said he would let me know if any progress was made."

136.    On information and belief, however, it was not Modernica that asked Dorsey to attend the conference in Michigan.  It was Defendant.

28

137.    On further information and belief, the conference in the Eames Lawsuit was a great success for Defendant and was the start of the transfer of the Nelson IP to Defendant.  But in spite of Modernica's interest in settlement, Dorsey, who was in attendance for GNF, downplayed results to Plaintiffs, reporting that there were "no breakthroughs."

138.    Behind the scenes however, GNF was actively involved in helping Defendant close the Bubble Lamp IP deal.

139.    At all relevant times, GNF and Defendant kept Plaintiffs and their counsel uninformed about the Bubble Lamp IP transaction and the true intentions of GNF and Defendant. In fact, GNF constantly informed Plaintiffs' counsel that GNF and the Nelson family had common interests.  Given that the stated purpose of GNF was to protect the legacy of George Nelson, the Plaintiffs relied on these assurances, ultimately to their great harm.

140.    In June 2015, Plaintiffs' counsel (working with very limited information) was confused about the nature of the transfer.  He asked Lopez, "shouldn't the foundation be the signatory since the [Bubble Lamp] rights were legally transferred to them?"  Lopez responded:

> Actually No, there is the IP right and the Income right. The foundation owns the IP rights in certain instances and the Nelsons owns (sic) the right to income from the IP. So, the family has to sign since its receiving the income (the royalty). The foundation has to Agree and Acknowledge the agreement once signed, however.  I have discussed this issue with the Foundation's counsel and he agrees.  I have copied Will.

This response was untrue and misleading.  Regarding the Bubble Lamp IP, GNF owned it as part of the Nelson IP transferred through the IPAA, but since the Bubble Lamp IP was not being licensed at the time by GNF, the Nelson family had no royalty (or "income" rights) in the Bubble Lamp IP.  Upon information and belief this statement was made to confuse the issues further and get Plaintiffs to sign off on the fraudulent deal with Modernica.

29

141.    On information and belief, throughout July 2015, Lopez and Dorsey continued to collude heavily with respect to settlement opportunities in the Eames and Bubble Lamp Lawsuits that would result in the Bubble Lamp IP being transferred to Defendant.

142.    Absent Defendant, GNF and Stein's deceptive behind-the-scene actions (individually and collectively) and Defendant's undue influence over GNF, GNF would have obtained the infringing Modernica Design Registrations at issue and/or would have agreed to settle its suit with Modernica with the payment of a lump sum and/or royalties to Plaintiffs, who desired this result.  GNF was aware that Plaintiffs desired such a resolution and specifically did not allow for a negotiation of a license with Modernica because Defendant did not desire that result.

143.    Instead, despite the clear violation of its own conflict-of-interest policy, GNF unanimously voted to authorize Defendant acquiring the Bubble Lamp IP.

144.    On information and belief, no Board member abstained from voting—even though all, save possibly one Board member, Barry Bergdoll, had close relationships with Defendant that violated the GNF conflict-of-interest policy.

145.    Upon information and belief, even Mr. Bergdoll had a conflict of interest because Defendant has donated George Nelson designs to MOMA.  Plaintiffs assert that this donor/donee relationship with MOMA causes Mr. Bergdoll to have a conflict of interest as well.  The consequence of this conflict of interest is that there was no truly independent member on the GNF Board to approve the transaction relating to the Bubble Lamp IP.

146.    The unanimous vote resulted in a very curiously worded acknowledgement issued by GNF on September 17, 2015, entitled "Acknowledgement of Addendum to Royalty Agreement for Nelson Branded Lamp Products" ("GNF Acknowledgment") that purported to sanction the Bubble Lamp transaction only.  GNF did not "acknowledge" Defendant's license, which was in

the form of an Addendum to the 2006 Royalty Agreement, with the Nelson family on non-Bubble Lamp products.  GNF's failure to acknowledge the Addendum means the license as to the non-Bubble Lamp products is not effective.

147.    In the Addendum, there were two categories of George Nelson design products addressed, one related to the "Nelson *branded* Bubble Lamp Products" and the other related to "Nelson *branded* products not covered in the March 22, 2006 Royalty Agreement."

148.    Unbeknownst to Plaintiffs and their counsel (who relied on false explanations of Defendant about the nature of the transfer discussed above), the word "branded" was very significant, meaning that Defendant was responsible for paying royalties only if the designs were actually branded with the George Nelson name.  If the design was not branded with the George Nelson name, the Nelson family gets nothing.  Further the Addendum only provides for royalties on the Bubble Lamps if they are branded with the NELSON or GEORGE NELSON name.  This is because Defendant knew Defendant now owned the Bubble Lamps and wouldn't be paying royalties on something they owned.

149.    Moreover, while the Addendum also included "Nelson branded products not covered in the March 22, 2006 Royalty Agreement" GNF never authorized the payment of such royalties to the Nelsons, meaning that Defendant can sell (and likely are selling) Nelson certain branded products without paying Plaintiffs a dime.

**C.      The Eames Lawsuit and Bubble Lamp Lawsuit Settle and Defendant (Who, Again, Was Not Even a Party to the Bubble Lamp Lawsuit) Gets the Bubble Lamp IP**

150.     The Bubble Lamp Lawsuit settled on September 17, 2015.  The settlement was completely controlled by Defendant who, again, was not a party to that action.

151.     Typically, settlement of an intellectual property lawsuit involves agreements between the parties to the lawsuit regarding destruction of infringing products, payments to the plaintiff, agreements to cease use of infringing intellectual property and/or a license agreement to permit the defendant to continue its activities. None of this happened with the Bubble Lamp Lawsuit. Instead, Defendant essentially paid a low-ball amount of money to Modernica to buy it out of the jam it found itself in and acquired the infringing and unauthorized business Modernica had set up.

152.     The Bubble Lamp Lawsuit settlement was analogous to a car thief selling a stolen car to a third party for a very low price and that third party convincing the car owner to drop its claims against the car thief.

153.     In the settlement, Defendant paid to purportedly obtain intellectual property and other rights and/or interests related to the Bubble Lamp IP along with Modernica's entire infringing Bubble Lamp Business.  Defendant now claims ownership of any intellectual property rights relating to and/or the interests in the Bubble Lamps and the molds and equipment used to manufacture the Bubble Lamps.   This includes but is not limited to the Modernica Design Registrations and the BUBBLE LAMPS Word Mark registration.

154.     Modernica was offered the ability to resolve its Eames litigation with Defendant along with making money on its infringing enterprise instead of having to bear the consequences

of its infringing activities.  Defendant essentially made Modernica an offer it could not refuse and could only have done so through its puppet GNF, the actual plaintiff in the Bubble Lamp Litigation.

155.    Although he originally offered to handle the Bubble Lamp infringement matter on a *pro bono* basis, Dorsey charged over $800,000 in attorney's fees, which were assessed wholly against the Nelson family in the form of credits against Defendant royalties. The family paid back Defendant for the fees charged by Dorsey's firm in full by December 2019.

156.    Even though they were saddled with the litigation costs, Plaintiffs received no intellectual property rights and/or interests as part of the settlement and obtained encumbered royalty benefits on the Nelson Marks from the lawsuit.  Because of Defendant' deceptive schemes, the Nelson family thought the Bubble Lamp IP had been transferred to GNF after the Modernica action was settled. This obviously did not happen.

157.    The Nelson family reasonably believed that they were receiving royalties for the Bubble Lamp IP interests.  They are not.

158.    After the transaction, Defendant worked to camouflage how the Bubble Lamp IP sale was effected because it knew the transfer was dubious in nature.

159.    For example, on its website, Defendant misstated how the Bubble Lamp IP was obtained and acknowledged that the acquisition was only possible because of the GNF suit against Modernica.  The company reported that a "recent agreement between Modernica and the George Nelson Foundation has resulted in Defendant assuming the global rights to manufacture and distribute the Nelson$^{TM}$ Bubble Lamps, as well as the right to use related trademarks and intellectual property."  Tellingly, Defendant avoided mentioning that it owned the Bubble Lamp interest.

160.    Furthermore, in its annual report for 2016, Defendant reported that it purchased the Bubble Lamp IP interest for about $6 million, but the transaction was heavily leveraged against other claims involving the Eames designs.  Accordingly, the price allocated to the sale by Modernica and Defendant is deceiving and does not take into account damages and other settlement options offered to GNF and Plaintiffs.

161.    Indeed, the Bubble Lamp sales since 2015, as shown on the royalty statements, reveal that the price negotiated to purchase the Bubble Lamp IP interest was extremely low and that the Bubble Lamp IP interest has an exorbitant value.  It is noteworthy that the royalty statements show the royalties being paid are based on wholesale sales figures, which is substantially less than the retail sale figures for the lamps.  Plaintiffs further believe Defendant may also be paying royalties to Stein and GNF  from the Nelson IP and reporting such payments as expenses, which would further deflate the sales figures reported in the royalty statements provide to the Nelson family.

162.    This is all pivotal because the royalty statements do not accurately indicate the enormous value of the Bubble Lamp IP interest.  GNF, by allowing such a valuable asset to be transferred to Defendant, violated conflict of interest rules imposed by the tax laws (and by its own Bylaws), which proscribe self-dealing transactions between a nonprofit and its substantial contributor.

## IV.    **After Improperly Obtaining the Bubble Lamp IP, Defendant Makes Fraudulent Misrepresentations to the USPTO Relating to the Bubble Lamp IP**

163.    Despite the fact that Defendant's puppet and alter ego, GNF argued in this very District, in the Bubble Lamp Lawsuit that the Modernica Design Registrations were procured by Modernica through fraud, Defendant was assigned (through its own fraudulent scheme) those very Modernica Design Registrations as part of the settlement of that litigation.  Defendant is the current

owner of the Modernica Design Registrations; indeed, the registrations were simply transferred from one infringer (Modernica) to another infringer (Defendant).

164.    Notably, as mentioned above, counsel for the Plaintiffs had filed a complaint in Maine on November 23, 2016, alleging that the assignment from Mrs. Nelson to GNF was an "improvident transfer" and demanding that it be set aside.  Plaintiffs had sent that complaint to Defendant's General Counsel, Tim Lopez on November 29, 2016.  Mr. Lopez however, refused to accept it and advised Plaintiffs' counsel to send it to Dorsey, GNF's counsel.

165.    Despite the foregoing, a few weeks later on December 22, 2016, Lopez, in his capacity as Defendant's General Counsel, filed a voluntary declaration in connection with each of the Modernica Design Registrations asserting that "[T]here has been no final decision adverse to the owner's claim of ownership of such mark for such goods and/or services or to the owner's rights to register same or to keep the same on the register; **and there is no proceeding involving said rights pending and not disposed of either in the Patent and Trademark Office or in the courts**." (Emphasis added).  The Declaration was not filed until three months later on March 21, 2017.

166.    Mr. Lopez knew that the foregoing statement was false when he made it and did so with the intent that the USPTO would grant "incontestable" status to the fraudulently procured Modernica Design Registrations.  Upon information and belief, Mr. Lopez quickly signed the Declaration even though it was not filed for three months so he could deny knowledge of Plaintiffs' action challenging the transfer of Nelson IP, including the Bubble Lamp IP.

167.    On May 8, 2017, the USPTO granted incontestable status to the Modernica Design Registrations—which it surely would not have done had Mr. Lopez not submitted false and fraudulent information.

V.    **Defendant Also Makes Material Misrepresentations to the IRS, Which Has Harmed and Will Continue to Harm Plaintiffs**

168.    To engineer both the fraudulent acquisition of the Nelson IP and the transfer of the Bubble Lamp IP to Defendant, Defendant masterminded a complex web of deception that included not only fraudulently obtaining property from an elderly and infirm woman but also filing tax returns with false, missing and misleading information to the IRS.

169.    Specifically, Defendant created GNF as its agent and alter ego, which it controlled and manipulated for its own ends.  Defendant used GNF as its agent, to fraudulently acquire Mrs. Nelson's rights to her husband's intellectual property (by way of the 2013 IPAA) and to keep this acquisition and Defendant's role from public scrutiny, then caused GNF to violate its federal tax obligations by not reporting on its Form 990-PF returns the receipt of this valuable property, the grant to Mrs. Nelson of royalties related to the Nelson IP, or the significant value of this intellectual property.  Indeed, from GNF's public filings, there is no indication whatsoever that GNF ever held any intellectual property, had any relationship or transaction with the Nelson family, or had any relationship with Defendant beyond that of being a purported recipient of charitable grants – a silence that, despite clearly violating federal tax law, was presumably important to Defendant so that its manipulation of both an elderly woman and GNF's charitable resources to further its commercial goals would remain secret.

170.    Defendant further used GNF as its puppet in securing ownership of the Bubble Lamp IP.  Defendant fronted the cost associated with the Bubble Lamp Litigation – that is, GNF's lawsuit against Modernica – through a loan agreement executed on June 4, 2014.  That loan agreement provided that Defendant would loan money to GNF so that GNF could pay these legal fees.  Pursuant to that loan, it appears that over $800,000 was loaned from Defendant to GNF in 2014 and 2015.  Because Defendant was a disqualified person under section 4946 of the Internal

Revenue Code with respect to GNF, any loan arrangement with Defendant must be reported on GNF's Form 990-PF's tax returns, as a potential self-dealing transaction, for each year for which the loan was in existence.  However, Defendant apparently had GNF disguise the money as false charitable contributions, reported on Schedule B of the Form 990, rather than as loans subject to repayment obligations, presumably both to disguise the loan arrangement and to allow Defendant to claim a false income tax deduction with respect to advancement of the loan.

171.    Although GNF, and not Defendant, was the plaintiff in the Modernica litigation, Defendant's role as the controller and manipulator of GNF was evident by virtue of its participation in the litigation and in the settlement, culminating in Defendant ultimately receiving the Bubble Lamp IP and GNF receiving nothing.  Tellingly, in the year in which the Modernica litigation settled (2015), and despite the fact that as a result of this settlement the extremely valuable Bubble Lamp IP should have returned to GNF, GNF reported year-end assets of less than $20,000, having spent virtually all of its assets only for Herman Miller to wind up the most value fruit from the Modernica litigation, that is, the Bubble Lamps assets.   This use of GNF's assets for the benefit of Defendant clearly constituted a self-dealing transaction under federal tax law, and clearly demonstrates the extent to which GNF was established and operated under the direction of and for the gain of Defendant.

172.    Under federal tax law, these self-dealing transactions by Defendant not only result in federal tax obligations owed by Defendant, but they also require Defendant to correct these transactions by returning to GNF not only the improperly gained Bubble Lamp IP, but also all profits earned with respect to that IP, the Nelson IP, or any other assets of GNF that were used by or for the benefit of Defendant.  This return of all assets of GNF that Defendant took or used for itself, and all profits or other financial benefits realized by Defendantas a result of its

misappropriation of GNF's charitable assets, is mandated by section 4941(e)(3) of the Internal Revenue Code and the Treasury Regulations thereunder, which require "undoing the [self-dealing] transaction to the extent possible, but in any case placing the private foundation in a financial position not worse than in which it would be if the disqualified person were dealing under the highest fiduciary standards."  Failure to correct a self-dealing transaction may result in a penalty of up to 200 percent of the amount involved.

173.    Under federal tax law, these self-dealing transactions by Defendant not only result in federal tax obligations owed by Defendant, but they also require Defendant to correct these transactions by returning to GNF, not only the improperly gained Bubble Lamp IP, but also all profits earned with respect to that IP, the Nelson IP, or any other assets of GNF that were used by or for the benefit of Defendant.  This return of all assets of GNF that Defendant took or used for itself, and all profits or other financial benefits realized by Defendant as a result of its misappropriation of GNF's charitable assets, is mandated by section 4941(e)(3) of the Internal Revenue Code and the Treasury Regulations thereunder, which require "undoing the [self-dealing] transaction to the extent possible, but in any case placing the private foundation in a financial position not worse than in which it would be if the disqualified person were dealing under the highest fiduciary standards."  Failure to correct a self-dealing transaction may result in a penalty of up to 200 percent of the amount involved.

174.    Furthermore, by having GNF not report its purported receipt and ownership of the Nelson IP pursuant to the 2013 IPAA on its federal tax returns, Defendant caused GNF massively to underreport the value of its assets for the 2013 and following tax years, as a result of which GNF (falsely reporting a low net asset value on its federal returns to avoid having to disclose its role in the fraudulent IP transaction benefiting Defendant) did not satisfy its minimum distribution

requirements under section 4942 of the Internal Revenue Code for these years.  This failure, along with any penalties that may apply to GNF or Defendantfor causing it to file false or incomplete tax returns, may potentially result in millions of dollars of excise taxes and penalties imposed against GNF, which in turn could threaten the Nelson family's ownership of the IP were the IRS to impose a tax lien on all of GNF's purported assets.

175.    In addition, this use of GNF's assets for the benefit of Defendant (which ultimately resulted in GNF having nothing), could be treated as a virtual termination of GNF by effective transfer of its assets to Defendant in the form of the money used to pay the Modernica legal fees for the ultimate benefit of Defendant, and the Bubble Lamp IP which GNF, and not Defendant, should have received.  Dissolution in this fashion would violate both federal tax law (which under section 507 of the Internal Revenue Code requires a terminating foundation to transfer all of its assets to a qualifying charity, and not a for-profit company) and Michigan law, under which the consent of the Michigan Attorney General is required before a charity may dissolve or transfer all or virtually all of its assets to another organization.

176.    Furthermore, despite the fact that Defendant apparently had GNF falsely characterize its loans to GNF as tax deductible contributions by reporting those loan proceeds on GNF's Schedule B as charitable contributions, and despite the fact that per the terms of the 2014 loan GNF had the obligation to repay those loans, Defendant set up a scheme whereby it would reduce royalty payments to the family in amounts equal in the aggregate to what it loaned to GNF, which GNF (and not the Nelson family) owed to Defendant.  As a result of this scheme, Defendant apparently claimed false tax deductions for the loans to GNF despite the fact that it then secured effective repayment of those loans from the family, reducing the royalties that the family should have received.

177.    Finally, Defendant's fraudulent scheme resulted in Defendant receiving the highly valuable Bubble Lamp IP, which should instead have returned to GNF, from where it would be returned to the Nelson family along with the other Nelson family IP upon rescission of the IPAA.

. **VI.**    **Defendant Continues to Infringe Plaintiffs' Nelson IP and Fraudulently Divert Royalties Away From Plaintiffs**

178.    Upon information and belief, as of the date of this filing, Defendant continues to use in commerce and license to others, Plaintiffs' Nelson IP, including the Bubble Lamp IP it now fraudulently owns outright, without authorization from Plaintiffs.

179.    On January 27, 2022 the Illinois lawsuit settled and was dismissed. Terms of the Settlement of the Illinois lawsuit included the unwinding of the IPAA, as if it never had existed, and the assignment back to Plaintiffs of the Nelson IP including the NELSON and GEORGE NELSON registrations from GNF to Plaintiff Estate of Jacqueline Nelson.   This assignment relating to registrations has been submitted for recordal with the U.S. Trademark Office.

180.    Because the IPAA no longer is in force and Plaintiff Estate of Jacqueline Nelson is now the owner of the Nelson IP and the NELSON and GEORGE NELSON marks, such conduct amounts to infringement of Plaintiffs' valuable intellectual property.

181.    Furthermore, upon information and belief, in August 2014, Defendant suggested that GNF create another entity to retain royalties fraudulently diverted from the Plaintiffs through GNF's licensing activities.

182.    Upon information and belief, that new entity still exists and GNF, at the instruction of Defendant, is still diverting royalties away from Plaintiffs and into this unknown entity.

183.    In addition, on November 22, 2017 in connection with its efforts to register the marks DEFENDANT COLLECTION DESIGNED BY GEORGE NELSON, Serial No 87371960, Defendant explained to the USPTO that "[t]he George Nelson Foundation licensed the GEORGE

40

NELSON name for Defendant's use in connection with furniture designed by George Nelson.  Defendant's use and registration of the DEFENDANT COLLECTION DESIGNED BY GEORGE NELSON and Design mark is consistent with the terms of the license agreement."  The USPTO responded that in typical license agreements there is no "unity of control" between a licensor and licensee to support registration of a licensed mark by a licensee.  Rather than get into the specifics of its relationship with GNF or the details of the alleged license, Defendant abandoned the application.

184.    Plaintiffs have never received royalties for any license between GNF and Defendant.

185.    Defendant also filed at least one lawsuit alleging infringement of the BUBBLE LAMPS word mark, common law rights in the Bubble Lamp IP and trademark rights in certain of the bubble lamp word marks obtained from Modernica.  Specifically, on April 9, 2020, Defendant filed a lawsuit entitled *Defendant and Design Within Reach v. Interior Icons*, 20-CV-00312 in the Western District of Michigan. That case settled by consent judgement and was closed on October 23, 2020. Upon information and belief Defendant received monetary settlement in connection with that judgement.

186.    Neither Defendant nor GNF ever disclosed the *Interior Icons* lawsuit nor its result to Plaintiffs.

187.    These infringing and fraudulent intentional acts on the part of Defendant support the pattern of deceptive and corrupt conduct that pose great harm to Plaintiffs, necessitating both monetary and equitable relief.

41

## COUNT I

### FRAUD
**(*Plaintiffs v. Defendant*)**

188.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

189.    As explained above, Defendant has engaged in a long-running intentional fraudulent scheme to obtain the Nelson IP through false pretenses and to divert royalty payments to themselves that should have been paid to Plaintiffs.

190.    Indeed, Defendant created a sham entity and alter ego—that is, GNF—for the sole purpose of duping Mrs. Nelson into unwittingly turning over the Nelson IP. GNF never fulfilled its purported mission statement in any way.

191.    Defendant stressed from the get-go that GNF would have an independent nature, that its sole purpose would be to showcase and honor George Nelson's work, and to benefit the Nelson family, and that its establishment would not require Mrs. Nelson to make any legal transfer of rights.

192.    Of course, Defendant and its agents knew these material representations were false at the time they were made.

193.    Defendant and its agents made the material representations with the intent that Mrs. Nelson would reasonably rely on them—which she did, to her (and the other Plaintiffs') extreme detriment.

194.    Specifically, in reliance on the representation that GNF would be independent and that she would not be required to make any legal transfer of her rights in the valuable intellectual property she had inherited from her husband, Mrs. Nelson gave her support to the formation of GNF.

42

195.    But despite the false promise that GNF would be independent, Defendant immediately stacked the GNF board with individuals with close ties to itself (including Stein).

196.    Defendant then used these relationships to direct and control GNF's activities.

197.    Indeed, as discussed above, GNF and Defendant's attorneys and agents drafted all versions of the IPAA, which Defendant aggressively pressed Mrs. Nelson to sign.  In doing so, Defendant falsely represented to Mrs. Nelson on numerous occasions that entry of the assignment was necessary to enforce the rights in the Nelson IP (and ultimately benefit Mrs. Nelson), which was not the case.

198.    Defendant knowingly and intentionally sent Mrs. Nelson drafts of the IPAA while she was in a nursing home/rehabilitation facility with a broken hip and diminished mental capacity and/or when she was receiving radiation therapy for bladder cancer and was very weak.

199.    Defendant knowingly and intentionally sent Mrs. Nelson drafts of the IPAA to Mrs. Nelson via email without copying her personal attorney, who they knew was representing her.

200.    Defendant also knowingly and intentionally sent the final version of the IPAA via email to Mrs. Nelson and Patrice—instead of Mrs. Nelson's legal agent under a power of attorney, Mico—when Mrs. Nelson was of significantly diminished capacity and/or incapacitated.

201.    On the date a physical package was sent to Mrs. Nelson containing the final IPAA, January 24, 2013, Mrs. Nelson was 93 years old and was in a rehabilitation center/nursing home in New Castle, Maine.  At that time she was still seriously ill from bladder cancer treatment, recovering from a hip fracture, and suffering from a diminished mental capacity.  There were no witnesses present upon receipt, and her son, Mico, who was then her legal agent under a power of attorney, was not present, nor was he directly notified of GNF's intentions with respect to the family legacy.

202.    When Mrs. Nelson signed the "final" IPAA, she wrote "1/24/2013" as the date of execution.  *See* Exhibit "C".  Clearly, Mrs. Nelson could not have received the agreement until sometime after 1/24/2013 because that was when the package was sent to her.  On information and belief, Mrs. Nelson saw the cover letter, which was dated 1/24/2013, and followed suit.

203.    The signed IPAA was mailed back to Dorsey on 1/29/2013.  This transaction establishes that, at the time she was presented with the contract, Mrs. Nelson was not oriented as to time, which is one of the indicators of diminished capacity.

204.    At the time she signed the IPAA, Mrs. Nelson suffered from limited mobility and significant loss of cognitive capacity such that she was wholly or partially dependent upon one or more persons for her basic needs, care, and support.

205.    Mrs. Nelson's physician at the time determined that she lacked capacity to execute the IPAA.

206.    Indeed, the issue of Mrs. Nelson capacity to execute the IPAA was raised by at least one entity against which GNF attempted to enforce the Nelson IP.

207.    Upon information and belief, GNF's own counsel had concerns about Mrs. Nelson's capacity to sign the IPAA as well.

208.    Even if Mrs. Nelson had the requisite cognitive capacity to understand and sign the IPAA (and she did not), GNF knew or should have known that Mrs. Nelson lacked the understanding and/or knowledge of the scope of the IPAA and related risks and consequences.  Nonetheless, Defendant forwarded the IPAA directly to Mrs. Nelson and coerced her to sign it without including her personal attorney or notifying her son Mico.

209.    The foregoing conduct of Defendant constitutes fraudulent inducement, wrongful undue influence, and duress.

210.    In addition, the foregoing conduct of GNF, Defendant, and their agents (including Stein) constitutes abuse of an elderly dependent person by procuring an irrevocable assignment of the Nelson IP and facilitating the disposition of valuable rights from an elderly woman without paying for those rights.

211.    The foregoing conduct of Defendant also constitutes, inter alia, a violation of the Maine Improvident Transfer of Title Act (33 M.R.S.A § 1022).  Specifically, pursuant to the Maine Improvident Transfer of Title Act, Mrs. Nelson's transfer of the Nelson IP to GNF is presumed to have been the result of undue influence because Mrs. Nelson was not represented by independent counsel in connection with the IPAA.

212.    Then, armed with GNF's fraudulently acquired Nelson IP—and in furtherance of the fraudulent scheme—Defendant subsequently lied to SDNY and WDMI in order to negotiate a convoluted (and highly improper) omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit that resulted in the transfer of the Bubble Lamp IP from GNF to Defendant.  This transfer of the Bubble Lamp IP interest to Defendant was an indirect transfer to a substantial contributor, which is proscribed by the tax laws and regulations of the United States.

213.    Upon information and belief, all of GNF's decisions relating to the Nelson IP (including but not limited to those that were made during the Bubble Lamp Lawsuit and Eames Lawsuit) were made for the benefit of Defendant, not George Nelson's legacy or the Nelson family.

214.    Indeed, Defendant, which was not even a party to the Bubble Lamp Lawsuit, used its connection with GNF to obtain strategic information about Modernica, and then used the information to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamps.

215.    Despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses—including those that were proposed during the Bubble Lamp Lawsuit and Eames Lawsuits.   Rather, Defendant and their agents repeatedly provided false information to Plaintiffs (on which Plaintiffs reasonably relied) regarding the nature and extent of their interests in the IP at issue throughout the duration of the settlement negotiations.

216.    Furthermore, Plaintiffs were duped into believing that the omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit would result in the infringing Bubble Lamp IP being turned over to GNF and that Plaintiffs would be receiving royalties for the Bubble Lamp IP interests.  These fraudulent misstatements resulted in Plaintiffs paying exorbitant legal fees for the Bubble Lamp Lawsuit.

217.    To date, Defendant continue to benefit from their fraudulent scheme, as they continue to collect royalties which rightfully belong to Plaintiffs, infringe Plaintiffs' valuable intellectual property, and enjoy fraudulently obtained tax benefits—all to Plaintiffs' extreme detriment.

218.    Defendant's conduct clearly constitutes fraud, for which Plaintiffs are entitled to actual damages, punitive damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

## COUNT II

### CONSPIRACY TO COMMIT FRAUD
### (*Plaintiffs v. Defendant*)

219.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

220.    As set forth above, Defendant intentionally acted in concert in pursuit of a long-running intentional fraudulent scheme to obtain the Nelson IP through false pretenses and to divert royalty payments to themselves that should have been paid to Plaintiffs.

221.    Defendant agreed to act in concert in furtherance of the common purpose of obtaining the Nelson IP from Plaintiffs and to divert royalty payments to themselves that should have been paid to Plaintiffs.

222.    In furtherance of the conspiracy, Defendant committed the acts described herein, including creating GNF as a sham entity for the sole purpose of duping Mrs. Nelson to unwittingly turn over the Nelson IP.

223.    Defendant stressed from the get-go that GNF would have an independent nature, that its sole purpose would be to showcase and honor George Nelson's work and to benefit the Nelson family, and that its establishment would not require Mrs. Nelson to make any legal transfer of rights.

224.    Of course, Defendant and its co-conspirators knew these material representations were false at the time they were made.

225.    Defendant and its co-conspirators made the material representations with the intent that Mrs. Nelson would reasonably rely on them—which she did, to her (and the other Plaintiffs') extreme detriment.

226.    Specifically, in reliance on the representation that GNF would be independent and that she would not be required to make any legal transfer of her rights in the valuable intellectual property she had inherited from her husband, Mrs. Nelson gave her support to the formation of GNF.

227.    But despite the false promise that GNF would be independent, Defendant immediately stacked the GNF board with individuals with close ties to itself (including Stein).

228.    Defendant then used these relationships to direct and control GNF's activities.

229.    As discussed at length in Count I (incorporated herein by reference), Defendant and Stein—through GNF—fraudulently duped severely ailing, 93-year old Mrs. Nelson into signing the IPAA, which effectively put all of the Nelson IP into the hands of GNF.

230.    Then, armed with GNF's fraudulently acquired Nelson IP, Defendant subsequently lied to SDNY and WDMI in order to negotiate a convoluted (and highly improper) omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit that resulted in the transfer of the Bubble Lamp IP from GNF to Defendant.  This transfer of the Bubble Lamp IP interest to Defendant was an indirect transfer to a substantial contributor, which is proscribed by the tax laws and regulations of the United States.

231.    Upon information and belief, all of GNF's decisions relating to the Nelson IP (including but not limited to those that were made during the Bubble Lamp Lawsuit and Eames Lawsuit) were made for the benefit of Defendant, not George Nelson's legacy or the Nelson family.

232.    Indeed, Defendant, which was not even a party to the Bubble Lamp Lawsuit, used its connection with GNF to obtain strategic information about Modernica and then used the information to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamps.

233.    Despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses—including those that were proposed during the Bubble Lamp Lawsuit and Eames Lawsuits.  Rather,

Defendant and their co-conspirators repeatedly provided false information to Plaintiffs (on which Plaintiffs reasonably relied) regarding the nature and extent of their interests in the IP at issue throughout the duration of the settlement negotiations.

234.    Furthermore, Plaintiffs were duped into believing that the omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit would result in the infringing Bubble Lamp IP being turned over to GNF and that Plaintiffs would be receiving royalties for the Bubble Lamp IP interests.  These fraudulent misstatements resulted in Plaintiffs paying exorbitant legal fees for the Bubble Lamp Lawsuit.

235.    To date, Defendant continues to benefit from their fraudulent scheme, as they continue to collect royalties which rightfully belong to Plaintiffs, infringe on Plaintiffs' valuable intellectual property, and enjoy fraudulently obtained tax benefits—all to Plaintiffs' extreme detriment.

236.    As a direct and proximate result of Defendant's conspiracy and its resulting fraudulent conduct, Plaintiffs have suffered and will continue to suffer damages

237.    Accordingly, Plaintiffs are entitled to actual damages, punitive damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

## COUNT III

### UNJUST ENRICHMENT
### (*Plaintiffs v. Defendant*)

238.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

239.    Defendant has gained appreciable benefits, including financial benefits and tax benefits, as a result of fraudulently obtaining the Nelson IP from Mrs. Nelson and/or obtaining the Nelson IP for less than full consideration.

240.    Defendant has also gained appreciable benefits from wrongfully collecting licensing fees associated with the Nelson IP, which should have gone to the Estate of Jacqueline Nelson and/or Mrs. Nelson's heir, Mico, instead.

241.    Plaintiffs have not received full compensation in exchange for the benefits received by Defendant.

242.    It is inequitable for Defendant to retain the benefits without payment of full value for them.

243.    Defendant has been unjustly enriched by virtue of their wrongful conduct.

244.    On information and belief, Defendant's acts are willful, wanton, calculated to deceive, and undertaken in bad faith.

245.    Equity requires Defendant to compensate the Estate of Jacqueline Nelson (and/or her heirs) for the money owed.

246.    A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant relating to the Nelson IP.

247.    There is no basis in law for Defendant to retain any sum of money improperly withheld from the Estate of Jacqueline Nelson and/or Mrs. Nelson's heirs.

248.    If allowed to retain the wrongfully obtained sums of money, Defendant would be unjustly enriched.

## COUNT IV

**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION
PURSUANT TO THE LANHAM ACT, 15 U.S.C. § 1125(a)
(*Plaintiffs v. Defendant and GNF*)**

249.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

250.    As set forth above, the IPAA has been unwound by GNF and no longer exists. Plaintiff Estate of Jacqueline Nelson now is the owner of the Nelson IP, including the Nelson Marks and the Bubble Lamp IP.

251.    Jacqueline Nelson was previously the sole owner of and had rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP.

252.    The Estate of Jacqueline Nelson is now the sole owner of and has rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP, and Mico Nelson has sole interests in the royalties in the Nelson IP.

253.    The Estate's rights and Mico's rights (and, before that, the rights of George Nelson and Jacqueline Nelson) in the Nelson IP, including the Nelson Marks and the Bubble Lamp IP predate Defendant's infringing  first use of the Nelson Marks and the Bubble Lamp IP.

254.    The Nelson IP, including the Nelson Marks and the Bubble Lamp IP are in full force and effect.

255.    The Nelson IP, including the Nelson Marks and the Bubble Lamp IP are nationally recognized, including within the Southern District of New York, in connection with furniture, lighting and related products.

256.    Defendant and GNF's continuing unauthorized use of the Nelson IP, including the Nelson Marks and the Bubble Lamp IP in connection with the purchase and offer for sale of furniture and lighting is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Defendant and/or GNF with Plaintiffs, or as to the origin, sponsorship, or approval of Defendant's goods or commercial activities by another person, in violation of 15 U.S.C. § 1125(a).

257.    As a direct and proximate result of Defendant and GNF's continuing unauthorized use of the Nelson IP, including the Nelson Marks and the Bubble Lamp IP, the Estate and Mico have suffered and will continue to suffer substantial injury to the business, reputation, and goodwill of George Nelson's legacy.

258.    By using the Nelson IP, including the Nelson Marks and the Bubble Lamp IP without the Estate's and Mico's approval or consent, Defendant and GNF have willfully infringed the Estate's and Mico's rights with the intent to trade upon the fame and goodwill associated with the Nelson Marks and the Bubble Lamp IP.

259.    Defendant's acts as alleged herein were committed with the intent to pass off their goods and services as the goods and services of, approved by, sponsored by, or affiliated with Plaintiffs, and with the intent to deceive and defraud the public.

260.    The intentional nature of Defendant's wrongful acts renders this case exceptional pursuant to 15 U.S.C. § 1117.

261.    The Estate and Mico are entitled to actual damages, lost profits, treble damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

262.    In addition, the Estate and Mico have been, are now, and will be irreparably harmed by Defendant's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

## COUNT V

### COMMON LAW TRADEMARK INFRINGEMENT
### AND UNFAIR COMPETITION
### (*Plaintiffs v. Defendant and GNF*)

263.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

264.     For the reasons set forth in Count I above, the IPAA is null, void and unenforceable.

265.     Jacqueline Nelson was previously the sole owner of and had rights to use and license the Nelson IP, including but not limited to the Nelson IP, including the Nelson Marks and the Bubble Lamp IP.

266.     The Estate of Jacqueline Nelson is now the sole owner of and has rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP, and Mico Nelson has the sole interests in the royalties in the Nelson IP.

267.     The Estate's and Mico's rights (and, before that, the rights of George Nelson and Jacqueline Nelson) in the Nelson IP, including the Nelson Marks and the Bubble Lamp IP predate Defendant' first use of the Nelson Marks and the Bubble Lamp IP.

268.     The Nelson IP, including the Nelson Marks and the Bubble Lamp IP are in full force and effect.

269.     The Nelson IP, including the Nelson Marks and the Bubble Lamp IP are nationally recognized, including within the Southern District of New York, in connection with furniture, lighting and related products.

270.     Defendant's continuing unauthorized use of the Nelson IP, including the Nelson Marks and the Bubble Lamp IP in connection with the purchase and offer for sale of furniture is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Defendant with Plaintiffs, or as to the origin, sponsorship, or approval of Defendant's goods or commercial activities by another person.

271.     As a direct and proximate result of Defendant's continuing unauthorized use of the Nelson IP, including the Nelson Marks and the Bubble Lamp IP, the Estate and Mico have suffered

and will continue to suffer substantial injury to the business, reputation, and goodwill of George Nelson's legacy.

272.    By using the Nelson IP, including the Nelson Marks and the Bubble Lamp IP without the Estate's and Mico's approval or consent, Defendant has willfully infringed the Estate's and Mico's rights with the intent to trade upon the fame and goodwill associated with the Nelson Marks and the Bubble Lamp IP.

273.    Defendant's acts as alleged herein were committed with the intent to pass off their goods and services as the goods and services of, approved by, sponsored by, or affiliated with Plaintiffs, and with the intent to deceive and defraud the public.

274.    The intentional nature of Defendant's and GNF's wrongful acts renders this case exceptional.

275.    The Estate and Mico are entitled to actual damages, lost profits, enhanced damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

276.    The Estate and Mico have been, are now, and will be irreparably harmed by Defendant's and GNF's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

**COUNT VI**

**CANCELLATION OF THE FRAUDULENTLY OBTAINED AND MAINTAINED MODERNICA DESIGN REGISTRATIONS PURSUANT TO 15 U.S.C. §§ 1119, 1052(d)**
(The Estate of Jacqueline Nelson v. Defendant)

277.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

278.    As explained above, the Estate of Jacqueline Nelson is the owner of the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP.

279.    As set forth in detail above, the Modernica Design Registrations (which infringe the Bubble Lamp IP) were fraudulently obtained by Modernica,, then fraudulently transferred to Defendant—who continues to use those marks and enforce those registrations and fraudulently obtained incontestable status for those registrations in further violation of the Estate's rights.

280.    As a result of the foregoing, the Modernica Design Registrations were maintained fraudulently by Defendant, are null and void and should be cancelled immediately.

## COUNT VII

### BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. Defendant)

281.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

282.    The relationship between Defendant and George Nelson was a longstanding one that Defendant used to gain Mrs. Nelson's trust after Mr. Nelson died in 1986.

283.    After Mr. Nelson passed, Defendant employed John Berry to convince Mrs. Nelson to transfer her IP rights to Defendant, or to a private foundation, to "protect" those rights.  Mr. Berry, preying on her advanced age and fears, told Mrs. Nelson that if she did not take steps to transfer the Nelson IP interests to Defendant, the Museum of Modern Art, a nonprofit, etc., the Nelson IP would be put into the public domain, which would "open[] wide the ability to copy the designs, confuse the public and reduce royalties."

284.    Defendant knew Mrs. Nelson had a personal attorney and intentionally excluded him from discussions regarding the creation of the foundation.  It then used Felhbaum, a trusted friend of Mrs. Nelson and a close working partner of Defendant itself in Europe, to talk Mrs. Nelson into supporting GNF.  Once Mrs. Nelson's support was obtained and her trust gained, Defendant then employed GNF to effect the transfer of Mrs. Nelson's Nelson IP to itself.  GNF

then filed a lawsuit against Defendant had a fiduciary obligation to act for or give advice for the benefit of Mrs. Nelson because the relationship is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions.  Causing GNF to convince Mrs. Nelson to assign her interest in the Nelson IP and her interest in the royalty payments to GNF without advising her of the tremendous tax pitfall and of the total loss of control was a breach of the fiduciary duty Herman Miller owed to Mrs. Nelson and her family.

285.    Indeed, by creating GNF and by causing GNF to coerce Mrs. Nelson into assigning her valuable Nelson IP to GNF, Defendant triggered major tax violations, jeopardizing the Nelson IP and royalty rights and putting Mrs. Nelson and the Nelson family at risk  to be deemed, without their knowledge, self-dealers under the Internal Revenue Code, to the great detriment of the family and to the detriment of the Nelson IP, which could be reached by the IRS for fines and penalties.

286.    In addition, Defendant violated its fiduciary duty to Mrs. Nelson by using its relationship with GNF to control the Modernica lawsuit, which was paid for by the Nelson family, and directing the extremely valuable Bubble Lamp interest to itself. This action also constituted a conflict of interest for Defendant.

287.    As a result of Defendant's breaches of Mrs. Nelson's confidence and trust, Plaintiffs have suffered significant monetary damages for which they are entitled to relief, plus interest, fees, costs, and such other relief as this Court deems just and proper.

## COUNT VIII

## BREACH OF CONTRACT
### (*Plaintiffs v. Defendant*)

288.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth at length herein.

289.     Defendant, through John Berry, sent Mrs. Nelson a proposal for the creation of GNF and asked for her support of the nonprofit. Between March and July of 2010, Defendant solicited Fehlbaum's assistance in negotiating Mrs. Nelson's support for the GNF proposal.  In addition to some practical terms, Mrs. Nelson made clear that under no circumstances were the Nelson family's royalty interests ever to be touched, nor should there ever be a requirement for the Nelson family to support GNF financially.

290.     In a letter dated July 29, 2010 Defendant and Fehlbaum memorialized the agreement and promised Mrs. Nelson that she would never have "to make any legal transfer of rights."  With that assurance, Mrs. Nelson wrote Defendant on August 9, 2010 that she accepted its proposal for GNF, would support it, and would agree to be an honorary board member.

291.     Defendant did not keep this promise.  When Mrs. Nelson was at her most feeble, Defendant caused GNF to secure Mrs. Nelson's transfer to GNF (via the IPAA) her entire interest in the Nelson IP, as well as her royalty interest, in complete contravention of the agreement of the parties.  Although the IPAA provided for the reassignment of the royalty interest to Mrs. Nelson, the other terms of the IPAA made GNF Mrs. Nelson's successor-in-interest to the royalty rights at the moment of her death.

292.     As a result of the IPAA terms and because of Mrs. Nelson's rapidly declining health, Mico was forced to petition the Maine Probate Court for authority to transfer the royalty interest to himself before Mrs. Nelson passed away to protect the family's royalty interest, creating gift taxes to accrue in the amount of $444,425 stemming from the lifetime transfer of the royalty interest by Mrs. Nelson.  Had Mico been allowed to inherit the rights after Mrs. Nelson's death, which she intended, which was just a little over one year later, the gift taxes would not have been charged.

293.    The attempted transfer of the royalty rights to GNF is a breach of Defendant's express promise to Mrs. Nelson not to touch the family's royalty interest.

294.    As a result of Defendant's breach of the promises it made to gain Mrs. Nelson's support for the creation of GNF, Plaintiffs have suffered significant monetary damages for which they are entitled to relief, plus interest, fees, costs, and such other relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs for a judgment in their favor and against Defendant on its claims set forth above and request the following relief:

A.    Entry of an Order permanently enjoining Defendant, their officers, employees, agents, attorneys and all persons acting in concert, participation or combination with them from imitating, copying, licensing, or making unauthorized use of the Nelson Marks and Bubble Lamp IP, including, without limitation, by manufacturing, reproducing, displaying, promoting, offering for sale, selling, distributing, importing or exporting products bearing the Nelson Marks and Bubble Lamp IP;

B.    Entry of an Order permanently enjoining Defendant and their officers, employees, agents, attorneys and all persons acting in concert, participation or combination with Defendant from engaging in other activity constituting unfair competition;

C.    An award of monetary damages, including pre-judgment and post-judgment interest;

D.    An award of enhanced damages based on Defendant's willful infringement and unfair competition;

E.    An award of punitive damages;

F.      An award of Plaintiffs' reasonable attorneys' fees and costs as permitted by law;

G.      Cancellation of the Modernica Design Registrations; and

H.      Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury of any issues so triable.

**Royer Cooper Cohen Braunfeld LLC**

By: */s/ Donna A. Tobin*
Donna A. Tobin, Esquire
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
T: (212) 994-0454; F: (484) 362-2630
E: dtobin@rccblaw.com

Dated: July 15, 2022

**Norman, Hanson & DeTroy, LLC**
Doris V. Rygalski, Esquire*
Two Canal Plaza
P.O. Box 4600
Portland, ME  04112-4600
207.553.4704  (Direct)
207.775.0806  (Fax)
E: drygalski@nhdlaw.com

*\*Pro hac vice application will be submitted*

*Attorneys for Plaintiffs*