UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICE NELSON, as Personal Representative
of the Estate of Jacqueline Nelson, and
GEORGES MICO NELSON,

        Plaintiffs,

v.

MILLERKNOLL, INC.,

        Defendant.

_____ /

Case No. 1:23-cv-464

HON. ROBERT J. JONKER

## OPINION AND ORDER

George Nelson was a renowned designer affiliated for many years with Herman Miller. Nelson's heirs and Herman Miller's successor have profited together for nearly twenty years from the successful marketing of Nelson-branded products. For the last decade, those products have included the iconic Nelson Bubble Lamp, which is at the heart of this case. When the parties added the Bubble Lamp to their royalty arrangement in 2015, Nelson's son was an enthusiastic champion of the idea. And why not? Over the past decade Nelson's heirs have received millions of dollars in Bubble Lamp royalties, proving the commercial success of the venture. For some reason, Nelson's son now wants to kill the proverbial Golden Goose and claw back certain IP rights that, even if he had them, would be of no value on their own. Despite poring through thousands of pages of briefing and exhibits, the Court still cannot fathom what Nelson's son hopes to gain. But ultimately, that is beside the point because the record unequivocally demonstrates that Plaintiffs both authorized and ratified all of the MillerKnoll conduct about which

1

they now complain. There is no genuine issue of material fact and MillerKnoll is entitled to judgment as a matter of law.

### BACKGROUND

### A. General Overview

This case is the battle of the Bubble Lamp. The story begins with George Nelson, a famous twentieth century industrial designer. For years, he served as design director at Herman Miller (now known as MillerKnoll ("HMI")). When George died in 1985, the Intellectual Property ("IP") rights to his designs—including the Bubble Lamps—passed to his wife, Jacqueline Nelson. In 2006, Jacqueline and HMI entered into a Royalty Agreement that assigned the IP rights of numerous Nelson-branded furniture products to HMI in exchange for a royalty fee. The agreement at that time, however, did not include Bubble Lamps.

In 2010, multiple HMI executives, with Jacqueline Nelson's support, formed the George Nelson Foundation ("GNF") to protect the Nelson IP and ensure its authenticity. It turns out the protection was needed. Since the 1990s, another furniture company—Modernica—had been selling Bubble Lamps with the Nelson IP. After Jacqueline and HMI discovered Modernica's sales, Jacqueline assigned her Nelson IP rights to GNF so that GNF could sue Modernica for infringing the Nelson trademark. Soon thereafter, GNF filed suit against Modernica in 2012. After years of litigation, the two sides eventually settled. As part of the deal, HMI purchased Modernica's Bubble Lamp business, including the IP rights Modernica held in the Bubble Lamp, such as configuration marks registered with the U.S. Patent and Trademark Office ("USPTO"). Modernica had been able to register the marks because neither George nor Jacqueline had done so before Modernica.

In 2015, Mico Nelson—George's son—entered the scene. Mico was eager to expand the original 2006 Royalty Agreement. About the time the GNF-Modernica litigation settled, Mico and

HMI finalized an addendum to the 2006 Royalty Agreement. The agreement, as amended, assigned the IP rights to all Nelson branded products, including Bubble Lamps, to HMI. In return for the assignment, HMI agreed to pay the Nelsons a 5% royalty fee. Before Mico signed the agreement, his lawyer informed him that HMI was purchasing Modernica's Bubble Lamp business and the accompanying IP rights. That information did not deter Mico. In fact, Mico conditioned the validity of the royalty agreement on HMI's completion of the purchase. With the 2015 assignment of the Nelson rights and the simultaneous purchase of the Modernica rights, HMI had all possible IP rights associated with the Bubble Lamp. With's Modernica's competing Bubble Lamp business out of the picture, HMI's Bubble Lamp sales boomed, generating millions of dollars of royalty payments to Mico.

This result seems like it would be a happy ending for all parties. But the Plaintiffs apparently disagree. Patrice Nelson, as Personal Representative of the Estate of Jacqueline Nelson, and Georges Mico Nelson allege that these events were part of a 15-year long, fraudulent scheme by HMI to procure ownership of the Bubble Lamp IP rights from the Nelsons. They now want it back. More precisely, they want some of it back. Plaintiffs never clearly define what they mean by the "Bubble Lamp IP." Throughout the briefing, the only specific thing that Plaintiffs point to are the registered Bubble Lamp configuration marks that HMI received in the Modernica settlement. Plaintiffs seem to realize that even their overarching fraud theory cannot explain or undo the Bubble Lamp rights Mico freely—even eagerly—assigned to HMI in 2015. And without these rights, the Modernica registrations have no practical value anyway.

In any event, after making millions of dollars from royalty payments, the Nelsons now ask the Court to enjoin HMI from using the Bubble Lamp IP; cancel any Bubble Lamp design registrations that HMI now possesses; and award monetary damages to Plaintiffs. HMI moves for

summary judgment. HMI argues this Court should grant summary judgment because Plaintiffs authorized and ratified HMI's conduct through the 2015 Addendum to the 2006 Royalty Agreement. The Court agrees and grants HMI's motion for summary judgment.

### B. George Nelson

George Nelson was a nationally renowned interior designer. Starting in 1945, George served as design director for HMI for over 25 years. *See George Nelson*, HERMANMILLER, https://www.hermanmiller.com/designers/nelson/. While design director at HMI, George created and introduced the Bubble Lamp. *Nelson Bubble Lamps*, HERMANMILLER, https://www.hermanmiller.com/products/accessories/lighting/nelson-bubble-lamps/. Like many of George's designs, the Bubble Lamp received much critical acclaim, earning itself a permanent display at the Museum of Modern Art in New York City. *Nelson® Bubble Lamps® by Herman Miller*, LIGHTOLOGY, https://www.lightology.com/index.php?module=vend&vend_id=518&bn=Herman-Miller.

While George was at HMI, however, he did little to safeguard his interest in the Bubble Lamp IP. For example, he never entered into a formal written agreement with HMI concerning the Bubble Lamp IP. (ECF No. 233-32, PageID 3496). Nor did he register "Nelson" or "George Nelson" as a trademark with the USPTO. (*See* ECF No. 220-12, PageID 2227). When George died in 1985, the IP rights to his designs—including the Bubble Lamp—passed to his wife, Jacqueline Nelson. (ECF No. 64, PageID 643). Like George, she also never registered the "Nelson" name with USPTO (ECF No. 220-12, PageID 2227). This failure to perfect the Nelson IP created an opening for Modernica.

### C. 2006 Royalty Agreement Between Jacqueline Nelson and HMI

In 2006, Jacqueline and HMI entered into a royalty agreement that assigned the IP rights in numerous Nelson products to HMI. (ECF No. 220-2). Discussions between HMI and Jacqueline began around 2005. (ECF No. 233-3, PageID 3231). Initially, Jacqueline had multiple questions and concerns about the original proposal. (*Id.*) For example, she wondered why the Royalty Agreement did not currently cover all "Nelson designed products." (*Id.*). From her perspective, if the agreement covered all Nelson products, that might eliminate "unnecessary complication." (*Id.*). Her thoughts were prophetic, and had the parties acted on them in 2006, this litigation might never have happened.

The parties finalized the agreement in 2006. The agreement stated that it "detail[ed] the longstanding relationship between [the Nelsons] and HMI," and it would "supersede all previous agreements." (ECF No. 220-2, PageID 2111). The agreement focused on HMI's rights regarding "Licensed Products." The agreement defined "Licensed Products" as "the products described in the "Product Description," which includes any "product otherwise agreed by the parties in writing to be subject to this Agreement." (*Id*. at 2112.). The "Product Description" section stated that "[t]he products include all Nelson designed products, as to which HMI *owns* the right to George Nelson designs . . . ." (*Id*. (emphasis added)).

The agreement outlined HMI's rights to the Licensed Products. Namely, it granted HMI ownership over the Nelson-branded product designs and allowed it to manufacture and use those products. (*Id.* at 2114). In one section entitled "Product Ownership and Licensees," for example, the agreement stated:

> HMI shall have the exclusive right, *title*, and interest to all inventions and designs subject to this Agreement, *and shall own all prototypes, models, specifications, drawings*, and other materials pertaining to any product covered by this Agreement. *HMI shall have the exclusive right to manufacture, or have manufactured, use, and*

*sell*, and to grant licenses to other to manufacture, have manufactured, use, and sell the Licensed Products throughout the United States.

(*Id.* (emphasis added)). Regarding more specific ownership rights, Plaintiffs also agreed that "no other person, firm, or corporation, other than HMI . . . has any title or ownership interested in the Licensed Products or in any United States . . . design registrations . . . ." (*Id.* at 2113).

In exchange for those rights, HMI agreed to pay "Mrs. Nelson the royalty rate for the Licensed Products of 1.5% per unit sold." (*Id.* at 2112). The agreement made clear that this royalty payment was "[i]n consideration for the assignment to HMI of patent rights, design registrations, and copyrights . . . for the life of the Licensed Products." (ECF No. 220-2, PageID 2114). The 2006 Royalty Agreement was limited to specific Nelson products, most of which were furniture. (*Id.* at 2118). At that time, Nelson-branded Bubble Lamps were not covered by the agreement. (*Id.*). Jacquleine retained these rights herself but never did anything with them on her own.

**D.  George Nelson Foundation**

Around 2010, numerous high level HMI executives, with the help and approval of Jacqueline Nelson, formed the George Nelson Foundation ("GNF"). The goal of the organization was to "protect, promote, and extend the legacy of George Nelson's work." (ECF No. 233-7, PageID 3253). The idea of a GNF-like organization appeared to originate with Jacqueline, long before GNF formed. During the 2006 Royalty Agreement negotiations, Jaqueline signaled to HMI that she was "considering establishing an entity which would guarantee authenticity of reproductions and ensure that quality is maintained" and wondered whether "HMI could help with this." (ECF No. 233-3, PageID 3232).

The first official proposal for the organization was outlined in December 2009. (ECF No. 233-7, PageID 3253). The proposal outlined the steps for creating the organization, which spanned

6

many months. (*Id.*). One of the first steps on the list was getting Jacqueline's approval and support for the organization. (*Id.*).

Around February 2010, an HMI employee started the GNF-formation process by filing articles of incorporation with the State of Michigan. (ECF No. 233-13, PageID 3270). About a month later, GNF founders approached Jacqueline seeking her support for the foundation. Jacqueline initially agreed "in principle" with GNF's creation but felt that certain changes needed to be made to the original proposal before she gave her approval. (ECF No. 233-10, PageID 3263). The executives approved her proposed changes[1] and amended the proposal accordingly. (ECF No. 233-11, PageID 3266). In July 2010, Brian Walker (HMI's CEO) and Rolf Feihlbaum (Vitra's CEO) sent an official letter to Jacqueline seeking her support for GNF. (ECF No. 233-8, PageID 3258).[2] They informed her that the foundation would be an "independent authority" for continued "authentication of all Nelson designs," and it would "help to protect the authenticity of George's work and guard against knock-offs." (ECF No. 233-18, PageID 3291). They further represented to her that this protection would "serve[] to optimize the revenue potential for your estate by increasing sales of authorized Nelson designs." (*Id.*)

In August, Jacqueline assented to GNF's creation. She stated that it was a "great pleasure" to support GNF and that it would be her "privilege" to serve as an honorary board member. (ECF No. 233-12, PageID 3268). In response, Brian Walker stated that he was thankful and "delighted" for her "enthusiastic reply" and "support" for GNF. (ECF No. 233-14, PageID 3273). He also

---

[1] For example, Jacqueline did not think that the proposed director, John Berry, would be a good fit for GNF. In response, Walker and Fehlbaum decided to appoint a different director. (ECF No. 233-11, PageID 3266).

[2] One part of the letter read, "Since Herman Miller and Vitra already own the design rights to all of George's furniture designs, it is not necessary for you to make any legal transfers of right." (ECF No. 233-8, PageID 3258).

stated, "We are ready to take the next steps of forming a legal entity and selecting a Board of Trustees." (*Id.*).

GNF's initial board was comprised of Karen Stein, Ben Watson (HMI's Executive Creator Director), Barry Bergdoll (Chief Curator at MOMA), and Rolf Fehlbaum. (ECF No. 220-42, PageID 2397-98). Jacqueline was named an honorary member.

### E. Modernica's Competing Bubble Lamp Business

Unbeknownst to HMI and the Nelson Family, Modernica—another furniture company—had been selling Bubble Lamps with the George Nelson trademark since the 1990s. Sometime around 2010, Jacqueline raised concerns to her attorney that third parties, specifically Modernica, were selling products with the "George Nelson" trademark. (ECF No. 233-19, PageID 3323). At that time, she also conveyed to her attorney that HMI did not have the design rights to the Bubble Lamp. (*Id.*). Jacqueline's attorney later conveyed these revelations to GNF. (*Id.*).

GNF confirmed Jacqueline's concerns in 2012. William Dorsey—an attorney providing pro bono service for GNF—investigated Modernica and its use of the George Nelson IP. (ECF No. 233-29, PageID 3475). Dorsey discovered that, in 2010, Modernica registered the "Nelson" and "George Nelson" mark for lamp use with the USPTO. (*Id.*). Two of these registrations were for Bubble Lamp configuration marks. (*Id.*). Modernica also had multiple applications pending for use of the Nelson trademark with fireplace tools. (*Id.*).

Dorsey recommended multiple courses of action. For example, he suggested that HMI contest the pending applications and register the remaining marks as soon as possible. (*Id.* at 3476-78). He also noted that Jacqueline Nelson could attempt to cancel the approved registrations by filing a lawsuit. (*Id.* at 3476). At the end of Dorsey's report, he advised that "if any person or entity other than Ms. Nelson were to register the mark, we would want to take steps to ensure that her

interests were protected . . . and that the assignment of the intellectual property rights from her to the entity was valid and enforceable." (*Id.* at 3477).

### F.  Intellectual Property Assignment Agreement

In February 2013, Jacqueline Nelson assigned her "George Nelson" IP rights to GNF through an Intellectual Property Assignment Agreement ("IPAA"). Discussions began in 2012. When describing the initial IPAA proposal to Jacqueline by email, GNF executive Karen Stein made clear "that assigning such rights to the Foundation is not intended to supersede or contradict any licensing and/or commercial arrangements . . . but rather [will] provide a mechanism by which to protect against infringement by others . . . ." (ECF No. 233-18, PageID 3299). This communication also included a forward email from Dorsey, which stated that it "would benefit all parties" if the George Nelson IP was protected on a long-term basis. (*Id.*).

As part of the agreement, Jacqueline agreed to "irrevocably" assign "all rights, title, and interest" she had in "each item of Intellectual Property." (ECF No. 220-4, PageID 2126). The IPAA party defined "Intellectual Property" as "all furniture designs, lamp, designs, clock designs . . . (including without limitation the . . . 'Bubble lamp')." (*Id.* at 2125). In exchange for the assignment of those rights, GNF agreed to pay Jacqueline all royalties that GNF would receive under any current licensee arrangement with a third party. (*Id.* at 2126).

Because GNF now possessed the IP rights to the Nelson name, it had standing to sue infringing companies, like Modernica, for trademark infringement claims.

### G.  GNF sues Modernica

In May 2013, GNF sued Modernica for trademark infringement in the Southern District of New York. Complaint, *The George Nelson Foundation v. Modernica, Inc.,*, No. 13-cv-3427 (S.D.N.Y. Sept. 29, 2015), 2013 WL 2182579. Among other things, GNF sought cancellation of

Modernica's USPTO-registered configuration marks based on fraudulent procurement. *Id.* at 12-13. From the beginning of the lawsuit, however, there was an "understanding . . . of what [the] achievable goal would be" through litigation. (ECF No. 233-30, PageID 3482). Although GNF "hoped" to cancel all Modernica registrations, the more realistic goal was cancelation of registrations "in areas outside of lighting." (*Id.* at 3485). Eventually, GNF determined that "[i]t would be virtually impossible . . . to stop Modernica from selling lamps." (ECF No. 233-30, PageID 3483). GNF's attorney Dorsey communicated these realizations to the Nelson family's attorney at the time, Robert Giordanella. (*Id.*).

In 2014, HMI also sued Modernica to prevent it from selling knockoffs of a different line of HMI furniture designed by Charles and Ray Eames. Verified Complaint, *Herman Miller, Inc. v. Modernica, Inc.*, No. 14-cv-161, (W.D. Mich. Sept. 22, 2015), 2014 WL 839760. Because HMI shared an interest with GNF in protecting the Nelson name for its own business, HMI offered to advance legal fees to GNF to cover the cost of its Modernica litigation (ECF No. 220-26, PageID 2334).

The GNF-Modernica litigation continued for over two years.

### H. Mico Hires Giordanella

Beginning in 2012, 93-year-old Jacqueline's health began to decline. (ECF No. 232-30, PageID 3086). She eventually relocated from her home in New York to a nursing home in Maine. (ECF No. 64, PageID 656).

In 2014, Jacqueline assigned power of attorney rights to her son, Georges Mico Nelson (ECF No. 220-23, PageID 2317). Later that year, acting as Jacqueline's power of attorney, Mico hired attorney Robert Giordanella to represent the Nelson family. (ECF No. 220-5, PageID 2171).

Giordanella's primary duty was to represent the family's interest during the ongoing Modernica litigation. (*Id.*).

Mico and Giordanella communicated regularly during the Modernica litigation. Around that time, Mico also routinely communicated his desire to expand the original 2006 Royalty Agreement to include all Nelson branded products, including the Bubble Lamps (ECF Nos. 220-18, 220-19, 220-20, 220-28, 220-29).

### I.  2015 Addendum to 2006 Royalty Agreement

In July 2015, Mico and HMI agreed to expand the 2006 Royalty Agreement to cover all George Nelson branded products, including Bubble Lamps. (ECF No 220-3, PageID 2120).

Starting in 2014, Mico's attorney sent multiple emails to HMI indicating the Nelson family's eagerness to finalize a licensing deal for the Bubble Lamps. (ECF Nos. 220-18, 220-19, 220-20). These emails indicated that Mico was "ang[ry]" that progress had not been made on finalizing a royalty agreement." (*Id.*). And that even if HMI was not yet ready, the Nelsons "need to finalize a license agreement" for the Bubble Lamps. (*Id.* at 220-19).

Mico reviewed the proposed agreement in 2015. The agreement expanded the 2006 Royalty Agreement's definition of "Licensed Product" to include both "Nelson branded Lamp Products" and the "Nelson branded products not covered" by the original agreement. (ECF No 220-3, PageID 2120). Further, the agreement stated that "the parties acknowledge and agree that HMI shall have the sole and exclusive right to manufacture, or have manufactured, use, and sell, and to grant licenses to others to manufacture, have manufacture, use and sell Nelson branded lamp products throughout the world." (*Id.* at 2121). The agreement also noted that it would become effective when HMI discloses "the date on which HMI acquires the intellectual property rights necessary for HMI to manufacture and sell" the Bubble Lamps. (*Id.* at 2120).

11

HMI agreed to pay a royalty rate of 5%—instead of the original 1.5%—to the Nelsons for the additional products, including the Nelson branded lamps. (*Id.*).[3]

Mico's attorney Robert Giordanella was initially hesitant about adding the Bubble Lamp to the 2006 Royalty Agreement because the agreement conferred ownership of the Bubble Lamp IP to HMI. (ECF No. 233-42, PageID 3567). In an email from Giordanella to William Dorsey, he noted that "[t]he Royalty Agreement is not so much a license as it is a means to compensate[e] Nelson for the rights owned by HM." (*Id.*). Further, he stated, "By adding the bubble lamp and other Nelson branded products to the definition of Licensed Products, aren't we saying that the foundation no longer owns the rights to those items?" (*Id.*).

A few days later, Giordanella emailed Mico to explain the agreement and its terms. (ECF No. 220-21, PageID 2311). In that email, he told Mico:

> I will be sending you later today . . . the addendum to the existing royalty agreement. As we discussed last week, *HM has worked out a deal to purchase from Modernica the rights to the bubble lamp as well as other lighting products*. In exchange for using the "Nelson" name with those lighting products, they will pay the Nelson family a royalty of 5%. The lighting products will be added to the list of products currently covered by the royalty agreement. . . . Because it is expending what I'm told [is] a significant amount of money to purchase the rights to the bubble lamp and other lighting products from Modernica, *HM will have the same broad rights with respect to the lighting products that it has with the other products covered by the Royalty Agreement*. . . . [A] 5% royalty applies to all Nelson branded lighting products . . . and there is an unspoken commitment to expanding the Nelson lighting products business by virtue of their purchase of the lighting product rights from Modernica.

(*Id.*).  In response, Mico said "[t]hanks for the very clear email." (ECF No. 220-31, PageID 2351). Mico never indicated to Giordanella that he did not understand the agreement or its implications. (ECF No. 220-14, Page ID 2257-58). Roughly a month later, Mico—acting as power of attorney

---

[3] The 2015 Addendum also included a system for HMI to recoup the legal fees it advanced to HMI. (ECF 220-3, PageID 2120). Mico was made aware of this payment structure before signing. (ECF No. 220-20, PageID 2308).

on behalf of Jacqueline—signed the addendum and sent a copy to his attorney. (ECF No. 220-24, PageID 2326).

Before Giordanella sent the signed addendum to HMI, he sought HMI's confirmation that it had agreed to acquire Modernica's "rights in the Bubble Lamp." (ECF No. 220-22, PageID 2313). He informed HMI that the Nelsons "assumed" that the agreement would be effective only if the rights were acquired. (*Id*.). HMI confirmed that it reached an agreement with Modernica to buy the IP rights. (*Id*.). When Giordanella sent the final signed copy of the 2015 Addendum to HMI, he reiterated the Nelsons' condition. He made clear in his email that "the addendum is submitted on the condition that HMI closes on the transaction with Modernica for the purchase of the bubble lamp rights." (ECF No. 220-23, PageID 2315). If that does not take place, the "addendum shall be null and void." (*Id*.).

Mico stated in his deposition that he has never refused to accept or offered to return a royalty payment. (ECF No. 220-5, PageID 2168). Nor does he contend that HMI has ever failed to pay him royalties under the terms of the Addendum. (ECF No. 220-5, PageID 2180). According to one of Plaintiffs' experts, Bubble Lamp sales have generated millions of dollars of royalties. (ECF Nos. 220-13, PageID 2245; ECF No. 233-15, PageID 3447).

### J. Modernica Settlement

In September 2015, GNF and Modernica finalized the terms of the settlement agreement (ECF No. 220-38, PageID 2386). As part of the settlement, Modernica agreed to assign its Bubble Lamp IP rights to HMI. Modernica assigned the "Nelson" and "George Nelson" marks, however, to GNF. (*Id.* at 2387). The GNF board reviewed the settlement and unanimously agreed to its terms. (*Id*. at 2386).

Also in September, HMI purchased Modernica's entire Bubble Lamp business. Under the Asset Purchase Agreement, HMI agreed to purchase 100 percent "of the intellectual property [Modernica] used" in its Bubble Lamp business. (ECF No. 220-43, PageID 2400). The parties outline the transfer of the relevant IP rights in the Trademark Assignment agreement (ECF No. 220-43, PageID 2415). Among other things, the agreement transferred the two Bubble Lamp configuration marks that Modernica had registered with USPTO to HMI. (*Id.* at 2419).

### K. Illinois State Court Litigation

In 2017, the Plaintiffs sued GNF, William Dorsey and his law firm, and Giordanella and his law firm in Illinois state court (ECF No. 233-36).

Plaintiffs primarily challenged the IPAA.[4] (*Id.*). They alleged that Jacqueline was incapacitated when she signed the IPAA and thus it is an invalid agreement. (*Id.*). The parties settled their lawsuit in 2022. As part of the settlement, GNF agreed to undo the IPAA. (ECF No. 220-44, PageID 2424). This meant that GNF would assign any rights it held in the Nelson IP— including the "Nelson" and "George Nelson" trademark—back to the Nelson family. (*Id.*). There was no mention of any rights related to the Bubble Lamp IP in the agreement.

Plaintiffs' claims against the attorneys were for malpractice. Plaintiffs claimed that both attorneys failed to adequately advise Plaintiffs of their rights in the Nelson IP and about the Modernica lawsuit and its consequences (*Id.* at 3537-39).

### L. Procedural Posture

In 2021, Plaintiffs filed this lawsuit against HMI and GNF in the Southern District of New York. (ECF No. 1). Plaintiffs subsequently amended their complaint multiple times. (ECF Nos. 57,

---

[4] There is some evidence that suggests that Mico contemplated challenging the IPAA starting in 2014. For example, in an email from Giordanella to Mico, Giodanella mentioned Mico possible attempt to "undo the assignment" due to his mother's "lack of capacity." (ECF No. 220-27, PageID 2337-38).

64). The Second Amended complaint is now operative. (ECF No. 64). Because the issues in this suit largely overlapped with the Illinois litigation, the Southern District of New York stayed these proceedings until the Illinois litigation resolved. (ECF Nos. 38, 39). After GNF settled with Plaintiffs in the Illinois litigation, the Southern District of New York dismissed GNF with prejudice from this suit (ECF No. 53). Only HMI remains.

In April 2023, the Southern District of New York granted a motion to transfer this case to the Western District of Michigan under the IPAA's forum selection clause. (ECF No. 72). Later that year, HMI moved to dismiss the Second Amended Complaint for failure to state a claim under Rule 12(b)(6), but this Court denied the motion as premature. (ECF Nos. 87, 110). After roughly eight months of discovery, HMI moved for summary judgment on every claim. (ECF No. 219).

### M. Summary of Claims

Plaintiffs allege an assortment of federal and state law claims: Fraud and Conspiracy to commit fraud (Counts I & II), Unjust Enrichment (Count III), federal and common law Trademark Infringement and Unfair Competition (Counts IV and V), and Cancellation (Count VI). (ECF No. 64, PageID 679-89).

Each of these claims is based on the following alleged plot line: HMI developed a fraudulent scheme with the main goal of procuring the Bubble Lamp IP from Nelsons. Per the allegations, the primary events—forming GNF, signing the IPAA, and initiating the Modernica lawsuit—were all part of HMI's scheme. According to Plaintiffs, the climax of HMI's scheme was when it received the Bubble Lamp IP from Modernica as part of the settlement agreement, allegedly without the Nelsons' knowledge. (*See* ECF No. 64). That final transfer is what Plaintiffs refer to as "the heart of this case." (ECF No. 229, PageID 2627).

The problem with the heart of Plaintiffs' case is that it has no foundation in the factual record. To the contrary, the record unequivocally establishes that Mico not only knew the details of the Modernica settlement, he pushed for it to close and even conditioned the 2015 Addendum on HMI closing the deal. He thereafter profited handsomely, receiving millions of dollars in royalties on the Bubble Lamp sales. Plaintiffs have no legally or factually viable claims against HMI.

## LEGAL STANDARD

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a summary judgment motion, "the ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 748–49 (6th Cir. 2012).

In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587 (1986). But that does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 381 (2007). A party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734–

16

35 (6th Cir. 2005). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813–14 (6th Cir. 2006). Ultimately, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Moreover, there is a difference between the facts and inferences in the summary judgment record, and a non-movant's characterization of those facts, which a court is not required to accept. It is well established that reviewing courts " 'need not accept as true legal conclusions or unwarranted factual inferences.' " *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 257, 533 (6th Cir. 2002) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

DISCUSSION

Plaintiffs argue that "[a]t the heart of this case is HMI's acquisition of certain rights in the Plaintiffs' Bubble Lamp IP . . . in settlement of a lawsuit." (ECF No. 229, PageID 2627). In other words, Plaintiffs' case hinges on whether HMI is unlawfully using and possessing the Bubble Lamp IP because of fraud in procuring the Bubble Lamp IP from Modernica, Jacqueline Nelson, or both. All of Plaintiffs' claims depend on establishing that alleged wrongful conduct.

HMI argues that this Court should grant summary judgment on every claim for two reasons: (1) Plaintiffs authorized HMI's conduct through the 2015 Addendum and (2) Plaintiffs ratified HMI's conduct by accepting millions in royalty payments form HMI.

The Court agrees. HMI's motion for summary judgment is therefore granted.

## A. Authorization

### 1. *Authorized Conduct Defeats State Law Tort Claims*

As a general matter, a party cannot sustain an action against a defendant based on conduct that the plaintiff authorized. On multiple occasions, the Sixth Circuit and courts within the Sixth

17

Circuit have found that a plaintiff's state law tort claim fails when the parties agreed to a contract that authorized the defendant's conduct. *See, e.g.*, *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 405 (6th Cir. 2003) (finding that because the parties' contract "authorized" the defendants to cancel the plaintiff's insurance policy, the defendants "actions [were] justified and [] not actionable as a matter of law"); *Laurels of Lake Orion, LLC v. First Nat'l Orion Loan, LLC*, No. 19-11543, 2020 WL 1866095 (E.D. Mich. Apr. 14, 2020). Notably, Plaintiffs agree with this general statement of law—they do not dispute that they cannot sustain a claim based on conduct they have authorized. (*See* ECF No. 229, PageID 2648 ("While it is true that a plaintiff cannot sustain a claim against a defendant based on conduct the plaintiff authorized . . . .")).

2.  *Authorized Use Defeats Trademark Infringement Claims*

For trademark claims, specifically, a person cannot bring a trademark infringement claim if they authorized the defendant's use of the trademark. Take Lanham Act claims. Under 15 U.S.C. § 1114(1), for example, a person commits a trademark infringement violation only if they use a registered mark "without the consent of the registrant." When interpreting § 1114(1), the Sixth Circuit has stated that "[a] party proves trademark infringement by showing (1) that it owns a trademark, (2) *that the infringer used the mark in commerce without authorization*, and (3) that the use . . . 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.' " *See Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (*quoting Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007) (emphasis added)).

Courts have also found that authorized use defeats Lanham Act unfair competition claims under 15 U.S.C. 1125(a). Although 15 U.S.C. § 1125(a), which protects unregistered trademarks, does not explicitly state that a violation occurs if the person uses goods "without the consent" of

the owner, courts interpreting § 1125(a) have read that requirement into the statute. Multiple courts, for example, have found that if the defendant is authorized to use the mark, there is no "likelihood of confusion." *See, e.g.*, *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) ("[W]here the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized."); *Nagler v. Garcia*, No. 05-74007, 2009 WL 10696691 (E.D. Mich. Mar. 17, 2009), *aff'd*, 370 F. App'x 678 (6th Cir. 2010) (denying § 1125(a) claim by citing *Segal*).

Michigan trademark infringement law[5] is modeled after the federal scheme. *Janet Travis, Inc. v. Preka Holdings, L.L.C.*, 306 Mich. App. 266, 271  (2014) ("As at common law, a plaintiff who alleges trademark infringement under MCL 429.42 must show: (1) its mark is valid, (2) it has priority in the mark, (3) *it is likely consumers will confuse defendant's mark with its own,* and (4) defendant used the allegedly infringing mark." (emphasis added)); *see Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 756 (E.D. Mich. 2002) (ruling that Michigan common law uses "the same . . . tests for federal trademark infringement and federal unfair competition"). Because Michigan trademark infringement law also contains the "confusion" element, it follows that using the mark as authorized would also defeat a claim under Michigan law. *See Segal*, 517 F.3d at 506.

---

[5] Where relevant, Michigan law applies to the state law claims. Under *Erie*, federal courts sitting in diversity must apply the substantive law of the state in which they sit. This includes a state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Normally, however, when a case is transferred under 1404(a), the transferee court will apply the state law of the transferor court. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). But that exception to *Erie* does not apply when the case is transferred under a valid forum-selection clause. When a party originally files suit in a forum other than the one named by the forum selection clause, a transfer of venue under 1404(a) will not result in the law carrying over from the transferor court. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 65 (2013). The Southern District of New York transferred this case to the Western District of Michigan under 1404(a). (ECF No. 72). The court found that the forum-selection clause within the IPAA applied to the parties and was enforceable, even though the IPAA was unwound in the Illinois litigation. (*Id.*).  Because the case was transferred under a forum selection clause, the *VanDusen* exception does not apply. Therefore, this Court, sitting in Michigan, will apply Michigan law rather than New York law.

Whether a plaintiff brings a claim under 15 U.S.C. § 1114(1), 15 U.S.C. § 1125(a), or the common law, they cannot sustain it if they authorized the defendant to use the trademark or other IP at issue.

### 3.   *Application*

The record shows that Plaintiffs, through the 2015 Addendum, authorized HMI to both (1) manufacture and use the Bubble Lamp IP and (2) procure the registered Bubble Lamp configuration marks from Modernica. Because all of Plaintiffs' claims stem from that conduct, the Court grants summary judgment on every claim.

### a.   Plaintiffs Authorized HMI's Use of the Bubble Lamp IP

The record unequivocally shows that through the 2015 Addendum, Plaintiffs authorized HMI to manufacture and use the Bubble Lamp IP. For that reason alone, the Court grants summary judgment on the federal and common law trademark claims.

First, the 2015 Addendum explicitly authorized HMI's use of the Bubble Lamp IP. The three-page agreement clearly stated: "HMI shall have the sole and exclusive right to manufacture, or have manufactured, *use*, and sell . . . *Nelson branded lamp products* throughout the world." (ECF No 220-3, PageID2121). Further, the original 2006 Royalty Agreement contained a similar provision: "HMI shall have the exclusive right to manufacture, or have manufactured, use, and sell . . . Licensed Products." The 2015 Addendum expanded the definition of "Licensed Products" to include Bubble Lamps. The text of both agreements, therefore, is unambiguous: by adding Bubble Lamps to the definition of "Licensed Products" in 2015, HMI had the exclusive right to manufacture and sell Bubble Lamps throughout the world.

The parties agree on this fact. Plaintiffs do not dispute it. Although Plaintiffs initially allege in their complaint that HMI's use of the Bubble Lamp IP was "unauthorized" (ECF No. 64, PageID

685-89), their briefing acknowledges that the 2015 Addendum grants HMI the right to manufacture and use the Bubble Lamp. (ECF No. 229, PageID 2650 ("HMI has the right *to manufacture and sell* Bubble Lamps . . . .")). Mico admitted as much in his deposition. (ECF No. 220-5, PageID 2180-81). Even Plaintiffs' proposed expert expressly affirmed HMI's right to use the Bubble Lamp IP. (ECF No. 220-15, 2267-68).

Because Plaintiffs authorized HMI's use of the Bubble Lamp IP, the trademark claims (Counts IV and V) are defeated.[6] The Court thus grants summary judgment on those claims.

  b.  Plaintiffs Authorized HMI's Procurement of the Bubble Lamp IP from Modernica

Plaintiffs attempt to sidestep their admission that HMI is fully authorized to manufacture and use the Bubble Lamp IP by claiming that HMI's "wrongful conduct" at issue is not merely its *use* of the Bubble Lamp IP but rather that it "received from Modernica fraudulently acquired trademark registrations . . . and now *own*s trademark registrations for the underlying designs of the Bubble Lamp." (ECF No. 229, PageID 2648). According to Plaintiffs, they never authorized HMI's receipt of the registered Bubble Lamp configuration marks from Modernica. And as such, the Court should not grant summary judgment on the state law claims because the state law claims are premised on Modernica's transfer of the Bubble Lamp configuration marks to HMI. The available evidence, however, shows that there is no material dispute of fact that the 2015 Addendum authorized HMI to not only *use* the Bubble Lamp IP but also *own* the Bubble Lamp IP that it received from Modernica. For that reason, the Court grants summary judgment Plaintiffs' remaining claims.

---

[6] Count IV explicitly names only § 1125. (ECF No. 64, PageID 686). But the count contains language that could be read as alleging a claim under § 1114 ("HMI's continued unauthorized use of the Nelson IP . . . ."). (*Id.*). If Plaintiffs are also attempting to plead a Section 1114 violation, summary judgment is also warranted on that claim.

First, the 2006 Royalty Agreement—which included Bubble Lamps by way of the 2015 Addendum—explicitly stated that HMI owns the designs subject to the agreement. By adding Bubble Lamps as a "Licensed Product" under the agreement, the Bubble Lamp became one of the "George Nelson designs" that "HMI *owns* the right to." (ECF 220-2, PageID 2111). The agreement further stated that HMI has the "exclusive . . . title . . . to all inventions and designs subject to this agreement." (*Id*. at 2114). Finally, the agreement stated that "*no other person*, firm, or corporation, other than HMI . . . has any *title or ownership interest* in the Licensed Products" (*Id.* at 2113 (emphasis added)). The agreement is unambiguous here: HMI owns the design of each Licensed Product.

Further, the 2006 Royalty Agreement explicitly stated that HMI had the right to possess design *registrations* under the agreement. For example, the terms state that HMI agreed to pay royalties to the Plaintiffs "[i]n consideration for the assignment to HMI of . . . *design registrations* . . . for the life of the Licensed Products." (ECF No. 220-2, PageID 2112 (emphasis added)). By signing the agreement, Plaintiffs also affirmed that "no other person, firm, or corporation, other than HMI . . . has any title or ownership interest . . . in any United States . . . *design registration*." (*Id.* at 2113 (emphasis added)). Put simply, the language above shows that the Plaintiffs specifically assigned all design registrations (i.e. the registered Bubble Lamp configuration marks[7]) to HMI, and HMI now has the sole right to those registrations. The agreement, therefore, explicitly authorized HMI to receive and possess the Bubble Lamp configuration marks from Modernica.

---

[7] Interestingly, Plaintiffs' complaint—but not their briefing—refers to the Bubble Lamp configuration marks as "Modernica design registrations." (ECF No. 64, PageID 689).

The evidence shows that Mico's attorney understood at the time the 2015 Addendum was signed that the terms of 2006 Royalty Agreement assigned ownership of the Licensed Product's IP rights to HMI. Before Mico finalized the 2015 Addendum, Robert Giordanella emailed Dorsey to clarify the scope of the agreement. Giordanella acknowledged that the 2006 Royalty Agreement was "not so much a license as it is a means to compensate[e] Nelson for the rights *owned* by HM." (ECF No. 42, PageID 3567 (emphasis added)). He recognized that if Mico signed the 2015 Addendum, adding Bubble Lamps to the 2006 Royalty Agreement, HMI would therefore have the legal right to own the Bubble Lamp IP, including its related configuration marks.

Plaintiffs argue that there is a material dispute of fact as to whether the 2015 Addendum authorized HMI's receipt of the Bubble Lamp IP because Mico "had no idea that the Bubble Lamp IP had been purportedly assigned to HMI by Modernica when he executed the 2015 Addendum." (ECF No. 229, PageID 2644). The facts, however, show that before Mico signed the 2015 Addendum, he knew that HMI agreed to purchase the Bubble Lamp IP rights from Modernica. Email exchanges between Giordanella and HMI attorneys show that HMI clearly divulged to Giordanella that it agreed to buy the Bubble Lamp IP rights from Modernica. Giordanella then informed Mico of these findings by telling him that HMI agreed to "purchase from Modernica the rights to the bubble lamp" and that "HM will have the same broad rights with respect to the lighting products that it has with the other products covered by the Royalty." Mico said "thank you for the clear email" in response. And when Giordanella sent the finalized 2015 Addendum, signed by Mico, he specifically conditioned the agreement on HMI's purchase of Modernica's right to the Bubble Lamp. If Mico was subjectively unaware that HMI owned the Bubble Lamp IP, it would be a purely metaphysical dispute in light of the overwhelming record of contemporaneous communication.

But more importantly, any dispute about Mico's actual, subjective understanding is immaterial because of the clear and unambiguous language in the agreement. Mico already assigned any right he had to the registered Bubble Lamp configuration marks to HMI in the 2015 Addendum. Even in a hypothetical scenario where the Bubble Lamp configuration marks passed to Plaintiffs instead of HMI after the Modernica settlement, HMI would still have the right to possess and use those marks because the 2015 Addendum assigned the Bubble Lamp "design registrations" to HMI. Either way, the full panoply of the Bubble Lamp IP rights winds up in the hands of HMI based on Mico's own signature.

Plaintiffs do not challenge the validity of the 2015 Addendum that Mico signed. Instead, they claim that the language in the 2006 Royalty Agreement is ambiguous. (ECF No. 229, PageID 2630). It is not. And any subjective misunderstanding is beside the point. Under Michigan law, a party cannot seek to avoid a contract's unambiguous terms because of a subjective misunderstanding. *See Nieves v. Bell Indus. Inc.*, 204 Mich. App. 459, 463 (1994) ("One who signs a contract cannot seek to avoid it on the basis that . . . he supposed that it was different in its terms."); *see also Franklin v. Haak*, 499 F. Supp. 3d 379, 397 (E.D. Mich. 2020) (noting that a plaintiff cannot sustain a fraud claim where he "misunderst[ood] . . . information that is not objectively false"). The 2015 Addendum unambiguously granted HMI the right to possess the registered Bubble Lamp configuration marks. It clearly states that the royalties are paid "[i]n consideration for the assignment to HMI of . . . design registrations" and that "no other person, firm, or corporation, other than HMI . . . has any title or ownership interest . . . in any United States . . . design registration." (ECF No. 220-2, PageID 2114). Because the addendum is unambiguous, Plaintiffs cannot escape its terms based on a claimed misunderstanding.

24

Because the 2015 Royalty Agreement is valid, grants HMI ownership of the Bubble Lamp designs, and assigns all "design registrations" to HMI, HMI was legally entitled to the receive the registered Bubble Lamp configuration marks from the Nelsons or Modernica, or both. Therefore, like the plaintiffs in *Wassau* who authorized the defendant's conduct by contracting with them, *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 405 (6th Cir. 2003), Plaintiffs here authorized HMI's conduct by contracting with HMI to grant it the Bubble Lamp IP rights. Plaintiffs may not turn around and sue HMI on the conduct that it has authorized.

There is therefore no material dispute of fact regarding the import of the 2015 Royalty addendum. Because there is no material dispute of fact on this issue, a reasonable jury could not find for the Plaintiffs. The Court therefore grants summary judgment on the remaining claims (Counts I through III, VI).

## B. Ratification

Even if Plaintiffs had not explicitly authorized HMI's receipt of the Bubble Lamp IP from Modernica, summary judgment would still be warranted because Plaintiffs ratified HMI's conduct by accepting millions of dollars of royalty payments from HMI.

### 1. *Legal Standard*

The Sixth Circuit has noted that a party "may not avail itself of the benefits of [a] contract, and then attempt to escape its obligations thereunder by claiming the original contract was unenforceable." *Bank of the Ozarks v. Perfect Health Skin & Body Ctr., PLLC*, 835 F. App'x 49, 57-58 (6th Cir. 2020) (finding the plaintiff could not challenge a payment deferral contract after he started making payments under the agreement's terms). Specifically, under a "ratification analysis, a party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it. *Id.* (quoting *Agristor Leasing-II*

*v. Pangburn*, 557 N.Y.S.2d 183, 185 (App. Div. 1990)). A plaintiff may ratify defendant's conduct by "remain[ing] silent or acquiesc[ing] in the contract for a long period of time after an opportunity exists to have it declared void, or acts upon the contract by affirmatively acknowledging it or performing under it." *Id.*

### 2. *Plaintiffs Accepted Millions of Dollars in Royalties from HMI Since 2015*

Here, as explained above, the plain terms of 2006 Royalty Agreement and the 2015 Addendum grant HMI (1) the exclusive right to manufacture and use the Bubble Lamp IP, and (2) the right to possess and own the registered Bubble Lamp configuration marks. Mico now seeks to escape those "obligations" by claiming that HMI is unlawfully using and possessing the Bubble Lamp IP after it fraudulently procured the Bubble Lamp IP rights from Modernica and the Nelsons. He seeks to reclaim the Bubble Lamp IP rights for himself. But from the moment Mico signed the 2015 Addendum, HMI has been paying Mico millions of dollars under the 5% royalty payment clause. And Mico has never declined a royalty payment under the contract. Even assuming Plaintiffs are correct that Mico had no knowledge of the alleged fraudulent conduct (which the record contradicts) until 2019 when he finally read the terms of the Modernica settlement, (ECF No. 229, PageID 2645), he continued to accept royalty payments under the 2015 Addendum. He still accepts them to this day. Therefore, even if HMI engaged in any wrongful conduct when procuring the Bubble Lamp IP rights from Modernica—and based on the record it did not—Mico cannot "avoid' the effects of the 2015 Addendum on that account. *See Bank of the Ozarks*, 835 F. App'x at 57.

Plaintiffs attempt to distinguish the applicable caselaw by arguing that unlike *Bank of the Ozarks*, Mico "has never received any such benefits" under the 2015 Addendum. They first assert that "HMI is not paying royalties to the Nelson family for its use of the Bubble Lamp IP." (ECF

No. 229, Page ID 2648). But that is not true. As noted above, the record, including Plaintiffs' own testimony, flatly contradicts that assertion. HMI expressly agreed to pay a 5% for the "exclusive right to manufacture [and] use" the Bubble Lamp. HMI's Bubble Lamp sales have generated royalties worth millions of dollars. And Mico admitted to never rejecting a royalty payment since he started receiving them in 2015. Plaintiffs provide no evidence to the contrary.

Plaintiffs then attempt to refine that argument by asserting that Mico "has never been paid a royalty by HMI on the Bubble Lamp configuration marks." (ECF No. 229, Page ID 2649).  But the record also contradicts this. First, because the 2015 Addendum specifically assigned the registered Bubble Lamp configuration marks to HMI and gave them the exclusive right to use those marks, the current royalty payments from HMI to Mico would include HMI's use of those marks. HMI is thus already paying royalties to Mico on the marks.

Furthermore, the way configuration marks operate demonstrates that Plaintiffs' current royalties include compensation for HMI's use of the configuration marks. Companies register configuration marks with USPTO to prevent competitors from selling knock-off versions of the product. *What Makes Trade Dress and Product Configuration So Complex?*, LARSON&LARSON, https://larsonpatentlaw.com/blog/the-complexity-of-trade-dress-and-product-configuration-applications/. The registered marks serve to increase the registering company's sales, and therefore any related royalty payments, because the holder would not have to compete with other companies that sell knock-off versions of the product. Less competition, more sales. Alone, then, the configuration mark would have little to no value *unless* the holder also has the authority to manufacture and use the product associated with the mark. The marks' value is tied to the ability to use and manufacture the underlying product. Every party agrees that HMI has the *exclusive* right

to manufacture and use the Bubble Lamps IP. Not even Plaintiffs have the right to use them. In the Plaintiffs hands, then, the configuration marks alone would be worthless.[8]

Mico does not support his allegations with any admissible evidence showing that HMI has been withholding royalty payments for its use of the configuration marks. He supplies only the conclusory allegations. But allegations alone do not create a material dispute of fact. Any reasonable fact finder must conclude that Plaintiffs accepted the HMI royalty payments and in so doing ratified the 2015 Addendum and all its effects. Because there is no material dispute of fact whether Plaintiffs ratified HMI's conduct, summary judgment is warranted on every claim.

### CONCLUSION

This Court denied HMI's motion to dismiss, noting that Plaintiffs' claims were of "operatic scope" and wondering whether they could "provide sufficient evidentiary support" to survive summary judgment. (ECF No. 110). The answer is emphatically "No." Every opera comes to an end. It's time for the curtain to fall on this one.

**ACCORDINGLY, IT IS ORDERED** that HMI's Motion for Summary Judgment (ECF No. 219) is **GRANTED** as to every Count in Plaintiffs' Second Amended Complaint (ECF No. 64)

This case is **CLOSED**.[9]  A separate Judgment will enter.

---

[8] This is another independent reason supporting summary judgment: Plaintiffs claimed injury from not having the configuration marks is no real injury at all. Plaintiffs claim that HMI's ownership of the configuration marks harms them because it "prevents" them from making those configurations. (ECF 229, PageID 2648). But under the 2015 Addendum, HMI is the only entity that is allowed to manufacture and use the Bubble Lamp IP. It has an exclusive right. Even if the configuration marks were in the Plaintiffs hands, they would not be able to use them. They have no right to "make" any of the configurations. Only HMI does. Plaintiffs are therefore not harmed by HMI's retention of the configuration marks.

[9] There are various other motions filed by both parties still pending in this case. In January 2025, HMI objected to some of Plaintiffs' submitted exhibits as inadmissible evidence. (ECF No. 240). In June 2025, Plaintiffs filed a motion to take multiple depositions, and they also seek to file a reply brief in support of that motion. (ECF Nos. 276, 279). Those motions do not affect the disposition of this case. Because the motion for summary judgment is granted, those pending motions are now **DISSMISSED AS MOOT**.

Dated:   September 29, 2025          /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE.